**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DAMIEN ZEPEDA,
*Defendant-Appellant*.

No. 10-10131

D.C. No.
2:08-cr-01329-ROS-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Chief District Judge, Presiding

Argued and Submitted
July 17, 2012—San Francisco, California

Filed September 19, 2013

Before: Ferdinand F. Fernandez, Richard A. Paez,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Watford

## SUMMARY[*]

### Criminal Law

The panel reversed jury convictions under the Major Crimes Act, 18 U.S.C. § 1153, which provides for federal jurisdiction for certain crimes committed by Indians in Indian country.

The panel held that the district court did not plainly err in admitting a tribal enrollment certificate into evidence pursuant to the parties' stipulation.

The panel held that the question of whether a tribe is federally recognized, as required for jurisdiction under § 1153, is a question of law; and that both the "Gila River Indian Community of the Gila River Indian Reservation, Arizona" and the "Tohono O'odham Nation of Arizona" are federally-recognized tribes.

The panel held that the tribal enrollment certificate was insufficient to establish that the defendant is an Indian for purposes of federal jurisdiction under § 1153, where the government introduced no evidence that the defendant's bloodline is derived from a federally recognized tribe.

The panel remanded for resentencing on a conspiracy conviction unaffected by this disposition.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Watford disagreed with the majority's determination that the government failed to present sufficient evidence from which a rational jury could infer that the defendant has a blood connection to a federally recognized tribe.

## COUNSEL

Michele R. Moretti, Law Office of Michele R. Moretti,  Lake Butler, Florida, for Defendant-Appellant.

Joan G. Ruffennach (argued), Assistant United States Attorney, Office of the United States Attorney,  Phoenix, Arizona, for Plaintiff-Appellee.

## OPINION

PAEZ, Circuit Judge:

On October 25, 2008, Damien Zepeda ("Zepeda") traveled with his brothers Jeremy and Matthew Zepeda ("Matthew") to the home of Dallas Peters ("Peters"), located on the Ak–Chin Reservation of Arizona.  Zepeda and Matthew opened fire upon the house's occupants, injuring Peters severely.  In a nine-count indictment, the government charged Zepeda with, *inter alia*, conspiracy to commit assault, assault with a deadly weapon, and use of a firearm during a crime of violence.[1]  The indictment alleged that

_____

[1] The nine counts included: (1) conspiracy to commit assault with a dangerous weapon and assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153, 371, and 2; (2) assault resulting in serious

Zepeda was an "Indian[]." Following a jury trial, Zepeda was convicted of all counts.

The Major Crimes Act, 18 U.S.C. § 1153, provides for federal jurisdiction for certain crimes committed by Indians in Indian country.[2] The statute does not define who is an Indian, and determining the proper boundaries of federal jurisdiction over Indians is a formidable task. It is now well-settled in this circuit that we apply the two-part test articulated in *United States v. Bruce*, 394 F.3d 1215 (9th Cir. 2005) to determine who is an Indian. We consider: (1) the defendant's degree of Indian blood, and (2) the defendant's tribal or government recognition as an Indian. *Id.* at 1223; *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009). More recently, we clarified that the first of these two prongs requires that the defendant's "bloodline be derived from a federally recognized tribe."[3] *United States v. Maggi*, 598 F.3d 1073, 1080 (9th Cir. 2010).

---

bodily injury against Dallas Peters, in violation of 18 U.S.C. §§ 1153, 113(a)(6) and 2; (3) use of a firearm during a crime of violence as charged in count 2, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; (4), (6), (8) assault with a dangerous weapon against Dallas Peters, Stephanie Aviles, and Jane Doe, in violation of 18 U.S.C. §§ 1153, 113(a)(3), and 2; and, (5), (7), (9) use of a firearm during the crimes of violence charged in counts 4, 6, and 8, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. Aviles was Zepeda's ex-girlfriend and Doe was Aviles's cousin. Both were present at the Peters residence on the night of the shooting.

[2] Although we are mindful that the term "Native American" or "American Indian" may be preferable, we use the term "Indian" throughout this opinion since that is the term used in 18 U.S.C. § 1153 and at issue in this appeal.

[3] In this opinion, we consider the first prong only.

This appeal calls upon us to decide whether a Certificate of Enrollment in an Indian tribe, entered into evidence through the parties' stipulation, is sufficient evidence for a rational juror to find beyond a reasonable doubt that the defendant is an Indian for the purposes of § 1153 where the government offers no evidence that the defendant's bloodline is derived from a federally recognized tribe. We hold that it is not.

## I.

At Zepeda's trial, the government introduced into evidence, as Exhibit 1, a document entitled "Gila River Enrollment/Census Office Certified Degree of Indian Blood."[4] The document bore an "official seal" and stated that Zepeda was "an enrolled member of the Gila River Indian Community," and that "information [wa]s taken from the official records and membership roll of the Gila River Indian Community." It also stated that Zepeda had a "Blood Degree" of "1/4 Pima [and] 1/4 Tohono O'Odham" for a total of 1/2. The Certificate was signed by "Sheila Flores," an "Enrollment Services Processor." The prosecutor and Zepeda's attorney stipulated to admission of the Certificate into evidence without objection.[5] Their stipulation stated: "The parties have conferred and have agreed that Exhibit 1[, the Tribal Enrollment Certificate,] . . . may be presented at trial without objection and [its] contents are stipulated to as fact."

---

[4] For the purposes of clarity, we refer to this document as the "Tribal Enrollment Certificate" or "Certificate" throughout.

[5] The stipulation, which was signed by counsel, was admitted into evidence as Exhibit 48.

The Tribal Enrollment Certificate was published to the jury through the testimony of Detective Sylvia Soliz, a detective for the Ak–Chin Police Department, who told the jury that she obtained the Certificate from the Gila River Indian Community in advance of trial, "confirming" that Zepeda was an enrolled member. The colloquy between Soliz and the prosecutor proceeded as follows:

> Q: [W]e've talked a little bit about Native Americans and Indian blood and that sort of thing. Is this a jurisdictional requirement that you have? Explain that for the jury.
>
> A: Yes, it is. I am only able to investigate if the witness would come to a federal status and the victim was an enrolled member of a tribe or – and if it occurred on the reservation boundaries.
>
> . . .
>
> Q: You talked about a certification of Indian blood. What is that?
>
> A: It's a piece of paper confirming through the tribe that you obtained from the enrollment office that confirms that this person is an enrolled member of their tribe and he[,] and they[,] do meet the blood quantum.
>
> Q: And is that sometimes used in determining whether that person might be able to receive tribal benefits from the tribe?

A: Yes, it does.

Zepeda's brother Matthew also testified regarding Zepeda's Indian status. Matthew testified that he was half "Native American," from the "Pima and Tiho" tribes, and that his Indian heritage came from his father. He also testified that he and Zepeda shared the same father, as well as the same mother, who was "Mexican."

No further evidence regarding Zepeda's Indian status was admitted. At the close of the government's case in chief, Zepeda moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that insufficient evidence supported his convictions.[6] The court denied his motion. Zepeda renewed his motion at the close of the evidence, and again, his motion was denied.

On appeal, Zepeda argues, *inter alia*, that the government failed to prove beyond a reasonable doubt that he was an Indian under § 1153. We agree.

---

[6] We note that although Zepeda did not present argument to the district court regarding the sufficiency of the evidence of his Indian status, "Rule 29 motions for acquittal do not need to state the grounds upon which they are based because 'the very nature of such motions is to question the sufficiency of the evidence to support a conviction.'" *United States v. Viayra*, 365 F.3d 790, 793 (9th Cir. 2004) (quoting *United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir. 1983)); *see also Cruz*, 554 F.3d at 844 n.4; *United States v. South*, 28 F.3d 619, 627 (7th Cir. 1994) (concluding that "Rule 29 does not require anything more" than "to put the government on notice that [a defendant] was contesting the sufficiency of the evidence in support" of a conviction); 8A Moore's Federal Practice ¶ 29.03(1), at 29–8 (2d ed. 1989); 2 Charles A. Wright, Federal Rules of Criminal Procedure § 466, at 653 (2d ed. 1982) ("Specificity is not required by Rule 29.").

## II.

Indian "tribes generally have exclusive jurisdiction over crimes committed by Indians against Indians in Indian country."**[7]**  *United States v. LaBuff*, 658 F.3d 873, 876 (9th Cir. 2011).  As we explained in *United States v. Begay*, 42 F.3d 486 (9th Cir. 1994):

> Indian tribes are recognized as quasi-sovereign entities that may regulate their own affairs except where Congress has modified or abrogated that power by treaty or statute. Courts have also recognized, however, that regulation of criminal activity in Indian country is one area where competing federal interests may override tribal interests.

*Id.* at 498.

To balance the sovereignty interest of Indian tribes and the United States's interest in punishing offenses committed in Indian country, Congress enacted two statutes, 18 U.S.C. §§ 1152 and 1153.  *Id.*  Section 1152, the General Crimes

---

**[7]** "[T]he term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof . . . and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."  18 U.S.C. § 1151.

Act,[8] grants federal jurisdiction over certain crimes committed in Indian country by non-Indians against Indians and vice versa, but excludes crimes committed by one Indian against another. *Id.*; *LaBuff*, 658 F.3d at 876. Section 1153, the Major Crimes Act,[9] creates federal jurisdiction for cases

---

[8] Section 1152 provides that:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152.

[9] Section 1153(a) provides:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and

in which an Indian commits one of a list of thirteen enumerated crimes in Indian country. *Id.* The government charged Zepeda and prosecuted him under the latter statute.

The question of Indian status operates as a jurisdictional element under § 1153. *Cruz*, 554 F.3d at 843; *Bruce*, 394 F.3d at 1228. Nonetheless, we have held that Indian status "is an element of the offense that must be alleged in the indictment and proved beyond a reasonable doubt." *Maggi*, 598 F.3d at 1077 (citing *Cruz*, 554 F.3d at 845; *Bruce*, 394 F.3d at 1229). We have also held that whether a defendant is an Indian is a mixed question of fact and law that must be determined by the jury.[10] *See Bruce*, 394 F.3d at 1218, 1223, 1229; *see also Maggi*, 598 F.3d at 1077; *Cruz*, 554 F.3d at 845. Indeed, it is the special province of the jury to resolve any factual disputes arising under the two prongs of the *Bruce* test. *See Bruce*, 394 F.3d at 1223; *Maggi*, 598 F.3d 1082-83; *Cruz*, 554 F.3d at 846-47.

"Although jurisdictional questions are ordinarily reviewed de novo, when a defendant brings a motion for acquittal in order to challenge the sufficiency of the *evidence* underlying a jurisdictional element, we owe deference to the jury's

---

penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a).

[10] As we explained in *Bruce*, "[m]ixed questions of law and fact are those in which 'the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.'" 394 F.3d at 1218 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n. 19 (1982)).

ultimate factual finding." *Cruz*, 554 F.3d at 843–44 (emphasis in original). "Accordingly . . . we review the district court's decision under the standard applied to sufficiency-of-the-evidence challenges: 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 844 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted)); *see also United States v. Nevils*, 598 F.3d 1158, 1163–67 (9th Cir. 2010) (en banc).

## III.

## A.

We first must determine whether the Tribal Enrollment Certificate was properly admitted into evidence, or rather, as Zepeda urges, whether its admission violated his rights under the Confrontation Clause. Because Zepeda did not object at trial to the district court's admission of the Certificate pursuant to the parties' stipulation, we review for plain error. *United States v. Wright*, 625 F.3d 583, 607 (9th Cir. 2010).

"The test regarding the validity of a stipulation is voluntariness." *United States v. Molina*, 596 F.3d 1166, 1168–69 (9th Cir. 2010). We have previously held that "'[s]tipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions.'" *Id.* at 1169 (quoting *United States v. Technic Servs.*, 314 F.3d 1031, 1045 (9th Cir. 2002) (alteration in original)). "'[S]tipulations serve both judicial economy and the convenience of the parties, [and] courts will enforce them absent indications of involuntary or uninformed consent.'" *Id.* (quoting *CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th

Cir. 1999) (alterations in original)). "A 'defendant who has stipulated to the admission of evidence cannot later complain about its admissibility' unless he can show that the stipulation was involuntary." *Id.* (quoting *Technic Servs.*, 314 F.3d at 1045).

Zepeda points to no record evidence that he entered into the stipulation at issue involuntarily. Rather, he points to a lack of record evidence that his attorney informed him of the contents of the stipulation and its legal effect, and asserts that his counsel's waiver of his Confrontation Clause rights was invalid. While his first contention is plausible, Soliz testified extensively regarding the Tribal Enrollment Certificate's contents, referring both to Zepeda's bloodline and to his eligibility for benefits from the Gila River Indian Community. This testimony at least put Zepeda on notice regarding the contents of the stipulation. Regardless, Zepeda bears the burden on appeal of pointing to record evidence showing that his consent was involuntary, and he has not done so here. *See Molina*, 596 F.3d at 1169.

Moreover, our case law recognizes that "defense counsel may waive an accused's constitutional rights as a part of trial strategy." *United States v. Gamba*, 541 F.3d 895, 900 (9th Cir. 2008). Counsel's authority extends to waivers of the accused's Sixth Amendment right to cross-examination and confrontation as a matter of trial tactics or strategy. *Wilson v. Gray*, 345 F.2d 282, 287–88 (9th Cir. 1965).

Zepeda argues that waiver of a fundamental constitutional right cannot *ever* constitute a sound trial strategy, particularly where, as here, the Tribal Enrollment Certificate purported to establish an essential jurisdictional element. It appears from the record, however, that Zepeda's attorney strategically

focused Zepeda's defense on the implausibility of government witnesses' testimony, as compared to Zepeda's markedly different version of the relevant events. He chose not to direct the jury's attention to Zepeda's Indian status, and informed the jury during his opening statement: "I will stipulate and concede things that ought to be conceded in terms of my client, Mr. Zepeda." Although ultimately not a winning strategy, it was clearly "deliberately made as a matter of trial tactics," and did not involve a "basic trial right[]" such as the decision "whether to plead guilty, waive a jury, testify in his . . . own behalf, or take an appeal." *Gamba*, 541 F.3d at 901 (quoting *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (internal quotation marks omitted)). Nor, as we discuss at length below, was the Tribal Enrollment Certificate sufficient to carry the government's burden of proof of Zepeda's Indian status. Thus, Zepeda's attorney did not violate Zepeda's Confrontation Clause rights when he stipulated to admission of the Certificate. *See Gamba*, 541 F.3d at 900; *Wilson*, 345 F.2d at 287.

Accordingly, we conclude that the district court did not plainly err in admitting the Tribal Enrollment Certificate into evidence pursuant to the parties' stipulation.

**B.**

Having determined that the Tribal Enrollment Certificate was properly admitted into evidence, we turn to whether, viewing all evidence in the light most favorable to the government, any rational juror could have found beyond a reasonable doubt that Zepeda was an Indian, on the basis of the slim evidence as to both prongs of the *Bruce* test. We begin by explaining that the *Bruce* test contains an "important overlay." *Maggi*, 598 F.3d at 1078.

As noted, "[t]he *Bruce* test requires that the Government prove two things: that the defendant has a sufficient 'degree of Indian blood,' and has 'tribal or federal government recognition as an Indian.'" *Cruz*, 554 F.3d at 845 (quoting *Bruce*, 394 F.3d at 1223, 1224). "The first prong requires 'some' Indian blood." *United States v. Ramirez*, 537 F.3d 1075, 1082 (9th Cir. 2008) (quoting *Bruce*, 394 F.3d at 1223). "Thus, 'evidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong.'" *Id.* (quoting *Bruce*, 394 F.3d at 1223).

"The second prong requires evidence that 'the Native American has a sufficient non-racial link to a formerly sovereign people.'" *Id.* (quoting *Bruce*, 394 F.3d at 1224). "Courts analyzing this prong have considered evidence of: '1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life.'" *Id.* (quoting *Bruce*, 394 F.3d at 1224). These four factors "are to be considered 'in declining order of importance.'" *Cruz*, 554 F.3d at 846 n. 6 (quoting *Bruce*, 394 F.3d at 1224). "[T]ribal enrollment is 'the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative' . . . . [E]nrollment, and indeed, even eligibility therefor, is not dispositive of Indian status." *Id.* (quoting *Bruce*, 394 F.3d at 1224-25 (some alterations in original)).

Our recent decision in *United States v. Maggi* made clear that "[t]here is an important overlay to the *Bruce* test: To be considered an Indian under . . . [§] 1153, the individual must

have a sufficient connection to an Indian tribe that is *recognized by the federal government*. Affiliation with a tribe that does not have federal recognition does not suffice." 598 F.3d at 1078 (emphasis in original).

In *Maggi*, we addressed the consolidated appeals of two defendants, Gordan Mann and Shane Maggi, both tried and convicted pursuant to § 1153. Mann was an enrolled member of the Little Shell Tribe of the Chippewa Cree, a tribe that was not recognized by the federal government, despite a longstanding petition for federal recognition. *Id.* at 1076. We noted that tribal enrollment records often include identification of an individual's percentage of Indian blood, and that this information is used to establish eligibility for enrollment. *Id.* Mann's enrollment record reflected his degree of Indian blood as 10/64 Chippewa and 11/64 other Indian blood. *Id.* Maggi's degree of Indian blood was 1/64 Blackfeet tribe, a tribe recognized by the federal government, and 1/32 Cree tribe. *Id.* at 1076, 1080–81. The record did not reflect whether Maggi was descended from a federally recognized group of the Cree tribe, such as the Rocky Boy Reservation Chippewa Cree, or a non-recognized group, such as the Little Shell Tribe Chippewa Cree. *Id.* Maggi was not an enrolled member of any tribe, though his mother's enrollment in the Blackfeet tribe entitled him to the receipt of certain limited benefits. *Id.* at 1076–77. Both Mann and Maggi argued in the district court that they were not subject to prosecution under § 1153 because they were not Indians. *Id.*

In *Maggi*, we commented that we had previously addressed the issue of whether prosecution under § 1153 requires membership in a federally recognized tribe in *LaPier v. McCormick*, 986 F.2d 303, 304–06 (9th Cir. 1993). In a

federal habeas petition under 28 U.S.C. § 2254, LaPier challenged his Montana state court conviction, maintaining that he should have been tried for his alleged crime in federal court under § 1153 because he was an Indian. LaPier, like Mann, was a member of the Little Shell Tribe of Chippewa Cree. *Id.* at 306. We reasoned that it did not need to examine whether LaPier had shown a sufficient degree of Indian blood or whether he had a sufficient connection to a tribe because he had failed to satisfy an *antecedent* requirement of affiliation with a federally recognized tribe:

> We need not address . . . the question whether LaPier has shown a significant degree of blood and sufficient connection to his tribe to be regarded as one of its members for criminal jurisdiction purposes. There is a simpler threshold question that must be answered first, and in this case it is dispositive: Is the Indian group with which LaPier claims affiliation a federally acknowledged Indian tribe? If the answer is no, the inquiry ends. A defendant whose only claim of membership or affiliation is with an Indian group that is not a federally acknowledged Indian tribe cannot be an Indian for criminal jurisdiction purposes.

*Id.* at 304–05 (internal quotation marks and citations omitted). We therefore concluded that LaPier was not entitled to habeas relief.

*Maggi* recognized that *LaPier*'s threshold requirement of affiliation with a federally recognized tribe stemmed from judicial and legislative acknowledgment that federal criminal

jurisdiction over Indians is not dependent on a racial classification, but upon the federal government's relationship with the Indian nations as separate sovereigns.  598 F.3d at 1078–79 (discussing *LaPier*, 986 F.2d at 305 ("Federal legislation treating Indians distinctively is rooted in the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a guardian-ward status, to legislate on behalf of federally recognized Indian tribes."), *United States v. Antelope*, 430 U.S. 641, 646 (1977) ("[F]ederal regulation of Indian affairs is not based upon impermissible classifications.  Rather, such regulation is rooted in the unique status of Indians as 'a separate people' with their own political institutions. . . . [I]t is not to be viewed as legislation of a 'racial' group consisting of 'Indians' . . . .") (quoting *Morton v. Mancari*, 417 U.S. 535, 553 n. 24 (1974)), and *Means v. Navajo Nation*, 432 F.3d 924, 930 (9th Cir. 2005)).

Accordingly, *Maggi* concluded that *LaPier*'s requirement of affiliation with a federally recognized tribe was not altered or superseded by the test announced in *Bruce*, "which presupposes that 'tribal or government recognition as an Indian' means as an Indian from a federally recognized tribe." *Maggi*, 598 F.3d at 1079 (quoting *Bruce*, 394 F.3d at 1223). It followed from this analysis that the first prong of the *Bruce* test requires "that the bloodline be derived from a federally recognized tribe." *Id.* at 1080; *see also* Ninth Cir. Model Jury Instr. No. 8.113 ("In order for the defendant to be found to be an Indian, the government must prove the following, beyond a reasonable doubt:  First, the defendant has descendant status as an Indian, such as being a blood relative to a parent, grandparent, or great-grandparent who is clearly identified as an Indian from a *federally recognized tribe* . . . .") (emphasis

added); *id.* cmt. ("The question of Indian status operates as a jurisdictional element under 18 U.S.C. § 1153. 'Some blood' evidence must be from a federally recognized tribe.") (citations omitted).

## C.

We turn to the substance of our sufficiency of the evidence inquiry. *Bruce* and its progeny make clear that Indian status is an element of any § 1153 offense, and as such, that it must be alleged in the indictment and proven beyond a reasonable doubt. 394 F.3d at 1229; *Maggi*, 598 F.3d at 1077; *Cruz*, 554 F.3d at 845. We must therefore determine whether the evidence presented at trial was sufficient, drawing all inferences in the government's favor, to satisfy the threshold question identified in *LaPier* and *Maggi*, namely, whether Zepeda's bloodline is derived from a federally recognized tribe. *See Cruz*, 554 F.3d at 843–44.

Our inquiry contains a legal component and a factual component. The question of whether a given tribe is federally recognized is a matter of law. The question of whether the government has proven that a defendant's bloodline derives from such a tribe is a question of fact for the jury to resolve.

## 1.

Federal recognition of an Indian tribe is a formal political act that "permanently establishes a government-to-government relationship between the United States and the recognized tribe as a 'domestic dependent nation.'" H.R. Rep. 103-781, at 2 (1994) (footnote omitted). With this understanding, we conclude that the question of whether a

tribe is federally recognized is best characterized as a question of law.

Our prior cases provide guidance. In *LaPier*, having determined that "[i]t is . . . the existence of the special relationship between the federal government and the tribe in question that determines whether to subject the individual Indians affiliated with that tribe to exclusive federal jurisdiction for crimes committed in Indian country," we stated that, "[t]o determine whether that special relationship exists—whether the United States recognizes a particular tribe—we defer 'to the political departments.'" 986 F.2d at 305 (quoting *Baker v. Carr*, 369 U.S. 186, 215 (1962)) (additional citations omitted). To that end, we recognized that the Bureau of Indian Affairs had compiled and published a list of federally recognized tribes in the Federal Register pursuant to 25 C.F.R. pt. 83, which we stated "appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry." *Id.* Consulting this list, we determined that LaPier was not an Indian because the tribe with which he claimed affiliation was not among the listed tribes. *Id.* at 306.

In *United States v. Heath*, 509 F.2d 16 (9th Cir. 1974), we considered the effect of the Klamath Termination Act, 25 U.S.C. § 564 *et seq.*, on the defendant's criminal conviction under § 1153, and found that federal criminal jurisdiction over the defendant was lacking because the Act terminated federal supervision over the Klamath Tribe. *Id.* at 19. In so holding, we explained that "[t]he Klamath Termination Act . . . was intended to end the special relationship that had historically existed between the Federal Government and the Klamath Tribe. While anthropologically

a Klamath Indian even after the Termination Act obviously remains an Indian, his unique status vis-a-vis the Federal Government no longer exists." *Id.* We therefore concluded that "18 U.S.C. § 1153 cannot serve to confer Federal jurisdiction with respect to crimes committed by terminated Klamath Indians." *Id.* Finally, in *Maggi*, discussed at length above, we found that the threshold requirement of a bloodline from a federally recognized tribe was lacking for one defendant because there was an "absence of evidence" that his bloodline derived from a recognized tribe. 598 F.3d at 1080.

This precedent, considered as a whole, reflects our recognition that there is a legal element embedded in the first prong of the *Bruce* test: Federal recognition is a legal status afforded to "American Indian groups indigenous to the continental United States . . . that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present." 25 C.F.R. § 83.3. The Bureau of Indian Affairs, in accordance with the governing regulations, affords the legal designation of federal recognition to those tribes that meet its criteria. *See id.* §§ 83.1–83.13 (noting procedures for establishing that an American Indian group exists as an Indian tribe). As we said in *LaPier*, "absent evidence of its incompleteness, the BIA list appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry." 986 F.2d at 305.[11]

---

[11] We note that consulting the BIA's list will not always end the federal recognition inquiry. *See* Felix S. Cohen, *Handbook of Federal Indian Law* § 3.02[5] at 143 (2005 ed.) ("Tribes not included on the list may be able to establish their status as federally recognized through other means,

The district court did not determine whether the tribes at issue here are recognized by the federal government.  On appeal, the government argues that both the "Gila River Indian Community of the Gila River Indian Reservation, Arizona" and the "Tohono O'odham Nation of Arizona" are federally-recognized Indian tribes.  We agree.  We recognize, as a matter of law, that both tribes appear on the BIA's list of federally recognized tribes.  *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 73 Fed. Reg. 18,553 (April 4, 2008); 74 Fed. Reg. 40,218 (Aug. 11, 2009); 75 Fed. Reg. 60,810 (Oct. 1, 2010).

**2.**

Having made the legal determination that the "Tohono O'odham Nation of Arizona" is a federally recognized tribe, we must decide whether the government presented sufficient evidence to prove that Zepeda's blood derived from that

---

however."). Congress retains the authority to recognize new tribes by statute and to restore the status of previously terminated tribes without any action by the BIA, a power it has exercised a number of times since 1979. *See, e.g.*, 25 U.S.C. §§ 566, 712a, 1300j-1, 1300b-11; *see also* Cohen § 3.02[5] at 144 & n.57; *id.* § 3.02[8][c], p. 168 & n.225. In addition, Congress has declared that it alone has the authority to terminate a tribe's federally recognized status. *See* Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(4), 108 Stat. 4791, 4791 (1994); Cohen § 3.02[8][a] at 164. That means the BIA's failure to include a recognized tribe on the list, whether deliberately or through oversight, would not strip a tribe of its federally recognized status unless Congress had spoken through express legislative action. *See* Cohen § 3.02[8][a] at 164 & n.196. Even today, then, circumstances remain in which determining a tribe's federally recognized status might entail interpreting the meaning and effect of congressional enactments.

tribe.[12]  The Tribal Enrollment Certificate identifies Zepeda's bloodline as 1/4 Pima and 1/4 Tohono O'Odham; and Matthew's testimony described his ancestral bloodline as "Pima and Tiho."  The government introduced *no* evidence that any of these Indian groups are a federally recognized tribe.

In essence then, the government asks us to fill in the evidentiary gap in its case.  There is no evidence in the record that the "Tohono O'Odham" referenced in Zepeda's Tribal Enrollment Certificate refers to the federally recognized "Tohono O'odham Nation of Arizona."  Zepeda argues correctly that the name "Tohono O'Odham" is *not* on the BIA list.  Further, he vigorously argues that:

> [The] appellation "Tohono O'Odham" describes the *collective* Tohono O'Odham population, a substantial portion of which has always resided in the Sonoran Desert of northwest Mexico.  The BIA specifically lists as federally recognized *only* the "Tohono O'odham Nation of Arizona," and *not* members of the collective "Tohono O'Odham" tribe, "wherever residing" that Zepeda's certificate apparently describes.

Zepeda's Resp. to Gov't's Mot. to Take Judicial Notice 2–3, ECF No. 69.

---

[12] We note that because we are concerned only with the first prong of the *Bruce* test, the status of the Gila River tribe is not actually relevant to our decision.  The government points to the Tohono O'odham Nation of Arizona as the only federally recognized tribe from which Zepeda's bloodline may derive.

"Determination of who is an Indian under [18 U.S.C. § 1153] is not as easy as it might seem." *Maggi*, 598 F.3d at 1075. Even under our deferential standard of review, we have vacated jury convictions for insufficient evidence of a defendant's Indian status. *See, e.g.*, *id.* at 1081, 1083 (vacating two convictions); *Cruz*, 554 F.3d at 851 (applying an even more deferential standard of review).

In *Maggi*, the government introduced evidence showing that defendant Mann had the following percentages of Indian blood: "10/64 Chippewa and 11/64 'other Indian blood.'" 598 F.3d at 1076. Although we recognized that some Chippewa tribes were federally recognized, e.g. the Rocky Boy Reservation Chippewa Cree, *id.*, we nonetheless concluded that no rational juror could have found that the Chippewa referenced in Mann's certificate of enrollment could have derived from that tribe. Nor did we think it possible that the jury could have inferred that "other Indian blood" could have referenced a federally recognized tribe. Rather, we concluded that the only rational finding a juror could make was that the Chippewa blood derived entirely from the Little Shell Tribe of the Chippewa Cree, a non-recognized tribe in which Mann was an enrolled member. *Id.* at 1080. Thus, we concluded that "[g]iven the absence of evidence of any blood from a federally recognized tribe, Mann cannot meet the first prong of *Bruce*, and his conviction must be vacated." *Id.*

We confront an analogous situation here. We are not free to speculate that Zepeda's Tohono O'Odham blood is derived from the Tohono O'odham Nation of Arizona. *See United States v. Andrews*, 75 F.3d 552, 556 (9th Cir. 1996) (noting that "[w]hile '[c]ircumstantial evidence can be used to prove any fact, . . . mere suspicion or speculation' will not provide

sufficient evidence" (citation omitted)); *see also United States v. Bennett*, 621 F.3d 1131, 1138–39 (9th Cir. 2010) (finding insufficient evidence to support a conviction); *Walters v. Maass*, 45 F.3d 1355, 1358–60 (9th Cir. 1995) (same); *United States v. Dinkane*, 17 F.3d 1192, 1195–98 (9th Cir. 1994) (same). Zepeda is not an enrolled member of the Tohono O'odham Nation of Arizona and the government submitted no evidence whatsoever to connect the appellation "Tohono O'Odham" to the federally recognized Nation of Arizona. We are not free to surmise that they are one in the same, just as we were not free to speculate that some of Mann's Chippewa blood could have derived from the federally recognized Rocky Boy Reservation Chippewa Cree. *Maggi*, 598 F.3d at 1076, 1080; *see also United States v. Ramirez*, 714 F.3d 1134, 1136, 1140 (9th Cir. 2013) (reversing a conspiracy charge and concluding that there was insufficient evidence to show that the defendant made an agreement to distribute meth despite the "ample proof that the defendant possessed and sold drugs" to his associate four times in one month in "escalating amounts").

Nor are we free to rely on facts outside of the record concerning the scope of the Nation of Arizona, because this evidence was not presented to the jury and could not have been relied upon by it. It is horn book law that we, as an appellate court, are limited to the record before the jury when assessing the sufficiency of the evidence. *See Jackson*, 443 U.S. at 317–18 (reciting that the sufficiency of evidence "constitutional standard must also require that the factfinder will rationally apply that standard to *the facts in evidence*" and that "the critical inquiry on review of the sufficiency of the evidence . . . [must be] to determine whether *the record evidence* could reasonably support a finding of guilt beyond a reasonable doubt" (emphasis added)).

The jury found that Zepeda was an Indian pursuant to § 1153 in the absence of any proof that Zepeda's bloodline derived from a federally recognized tribe. Because "there is no evidence that [Zepeda] has any blood from a federally recognized Indian tribe," *Maggi*, 598 F.3d at 1075, we conclude that no rational juror could have found Zepeda guilty beyond a reasonable doubt of counts 2 through 9 of the indictment, the offenses predicated on § 1153, and his convictions must be vacated.

## IV.

In sum, we hold that the Tribal Enrollment Certificate was insufficient to establish that Zepeda is an Indian for the purposes of federal jurisdiction under § 1153 because the government introduced no evidence that Zepeda's bloodline is derived from a federally recognized tribe. We do not suggest, in so holding, that a Tribal Enrollment Certificate may *never* be sufficient to meet the government's burden under the first prong of the *Bruce* test. Of course, future cases may present circumstances in which the Certificate itself reflects this information. But that is not the case here.

Because we hold that the government introduced insufficient evidence under the first prong of the *Bruce* test, we need not consider whether the Tribal Enrollment Certificate alone was sufficient to carry the government's burden as to the second prong. As to that issue, we express no opinion.

For the above reasons, Zepeda's convictions under § 1153, in counts 2 through 9 of the indictment, are REVERSED. Zepeda's conviction for conspiracy in violation

of 18 U.S.C. § 371 is unaffected by this disposition.**[13]** *See Begay*, 42 F.3d at 499 ("Section 371 is a federal criminal statute of nationwide applicability, and therefore applies equally to everyone everywhere within the United States, including Indians in Indian country.").

**REVERSED** in part and **REMANDED** for resentencing.

---

WATFORD, Circuit Judge, dissenting:

I agree with much of the majority's analysis, particularly its conclusion that whether a tribe has been recognized by the federal government is a question of law. But I disagree with the majority's ultimate determination that the government failed to present sufficient evidence from which a rational jury could infer that Zepeda has a blood connection to a federally recognized tribe. Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a rational jury could certainly infer that the reference in Zepeda's tribal enrollment certificate to "1/4 Tohono O'Odham" is a reference to the federally recognized Tohono O'odham Nation of Arizona.

---

**[13]** Zepeda raises numerous additional issues on appeal that are relevant to his conspiracy conviction. We addressed those issues in a separate memorandum disposition previously filed on January 18, 2013. *See United States v. Zepeda*, 506 F. App'x 536 (9th Cir. 2013).