**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DAMIEN ZEPEDA,
*Defendant-Appellant*.

No. 10-10131

D.C. No.
2:08-cr-01329-ROS-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Senior District Judge, Presiding

Argued and Submitted En Banc
June 18, 2014—Seattle, Washington

Filed July 7, 2015

Before: Harry Pregerson, Alex Kozinski, Barry G.
Silverman, Kim McLane Wardlaw, William A. Fletcher,
Ronald M. Gould, Richard A. Paez, Richard C. Tallman,
Consuelo M. Callahan, Sandra S. Ikuta and Morgan
Christen, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Kozinski;
Concurrence by Judge Ikuta

## SUMMARY[*]

### Criminal Law

The en banc court affirmed a defendant's convictions and sentence under the Indian Major Crimes Act, which authorizes federal jurisdiction over certain crimes committed by Indians in Indian country.

The en banc court held in order to prove Indian status under the IMCA, the government must prove that the defendant (1) has some quantum of Indian blood and (2) is a member of, or is affiliated with, a federally recognized tribe. The court held further that under the IMCA, a defendant must have been an Indian at the time of the charged conduct, and that, under the second prong, a tribe's federally recognized status is a question of law to be determined by the trial judge. Overruling *United States v. Maggi*, 598 F.3d 1073 (9th Cir. 2010), the en banc court held that the federal recognition requirement does not extend to the first prong of the Indian status test. The court held that the evidence at trial was sufficient to support the finding that the defendant was an Indian within the meaning of the IMCA at the time of his crimes.

The en banc court held that the defendant's sentence was not unreasonable because it was mandated by 18 U.S.C. § 924(c), which required the district court to impose consecutive mandatory minimum sentences on the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

defendant's convictions for use of a firearm during a crime of violence.

The en banc court agreed with the three-judge panel's reasons for rejecting the defendant's other arguments, and it adopted those reasons as its own.

Concurring in the judgment, Judge Kozinski, joined by Judge Ikuta, wrote that under the majority's holding, the IMCA is a criminal statute whose application, in violation of equal protection, turns on whether a defendant is of a particular race. Judge Kozinski wrote that he would instead affirm the conviction either by applying the IMCA to all members of federally recognized tribes irrespective of their race, or by holding, consistent with *Maggi*, that the jury had sufficient evidence to infer that the defendant's ancestry was from a federally recognized tribe.

Concurring in the judgment, Judge Ikuta, joined by Judge Kozinski, wrote that the court should not continue to define an Indian by the "degree of Indian blood" because this definition disrespects tribal sovereignty and perpetuates the "sorry history" of this method of establishing race-based distinctions.

**COUNSEL**

Michele R. Moretti (argued), Law Office of Michele R. Moretti, Lake Butler, Florida, for Defendant-Appellant.

Robert Lally Miskell (argued), Assistant United States Attorney, Office of the United States Attorney, Tucson, Arizona; Joan G. Ruffennach, Assistant United States Attorney, Mark S. Kokanovich and Randall M. Howe, Deputy Appellate Chiefs, and Ann Birmingham Scheel, Acting United States Attorney, Phoenix, Arizona, for Plaintiff-Appellee.

Paul Whitfield Hughes (argued), Charles Rothfeld, Michael Kimberly and Breanne Gilpatrick, Mayer Brown LLP, Washington, D.C.; David Porter, Sacramento, California, for Amici Curiae National Association of Criminal Defense Lawyers and Ninth Circuit Federal Public and Community Defenders.

**OPINION**

W. FLETCHER, Circuit Judge:

Damien Zepeda appeals from his convictions and sentence on one count of conspiracy to commit assault with a dangerous weapon and to commit assault resulting in serious bodily injury; one count of assault resulting in serious bodily injury; three counts of assault with a dangerous weapon; and four counts of use of a firearm during a crime of violence. We affirm.

The crimes took place on the Ak-Chin Indian Reservation in Arizona. The government charged Zepeda under the Indian Major Crimes Act ("IMCA"), 18 U.S.C. § 1153, which authorizes federal jurisdiction over certain crimes committed by Indians in Indian country. To sustain a prosecution under the IMCA, the government must establish that the defendant is an Indian within the meaning of that statute. Zepeda argues, among other things, that the evidence at trial was insufficient to support the jury's finding that he was an Indian under the IMCA.

In *United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005), we laid out a two-part test for establishing a person's status as an Indian under the IMCA: the defendant must (1) have Indian blood and (2) be recognized by a tribe or the federal government as an Indian. In *United States v. Maggi*, 598 F.3d 1073, 1080–81 (9th Cir. 2010), decided after Zepeda's trial had finished, we added a gloss to both prongs of the *Bruce* test, holding that the government must prove that (1) the defendant has a quantum of Indian blood *traceable to a federally recognized tribe* and (2) the defendant is a member of, or is affiliated with, a federally recognized tribe.

In the case now before us, a three-judge panel held that the government had not presented sufficient evidence to satisfy the first prong of the *Bruce* test as modified by *Maggi*. For the reasons we explain below, we overrule *Maggi*. While *Maggi* appropriately clarified the *second* prong of the *Bruce* test to require a relationship with a federally recognized tribe, *Maggi* erred in extending the federal recognition requirement to the *first* prong. We now hold that under the first prong of the *Bruce* test the government need only prove that the defendant has some quantum of Indian blood, whether or not traceable to a federally recognized tribe. We thus hold that in order to prove Indian status under the IMCA, the government must prove that the defendant (1) has some quantum of Indian blood and (2) is a member of, or is affiliated with, a federally recognized tribe. We hold further that under the IMCA, a defendant must have been an Indian at the time of the charged conduct, and that, under the second *Bruce* prong, a tribe's federally recognized status is a question of law to be determined by the trial judge.

We hold that the evidence at trial was sufficient to support the finding that Zepeda was an Indian within the meaning of the IMCA at the time of his crimes. We reject Zepeda's other challenges to his convictions and sentence.

## I. Background

We recount the evidence in the light most favorable to the jury's verdict. *See United States v. Hicks*, 217 F.3d 1038, 1041 (9th Cir. 2000). On October 25, 2008, Zepeda and his brother Matthew were drinking beer and malt liquor at Zepeda's mother's house in Maricopa, Arizona. Zepeda asked Matthew if he wanted to go to a party, and Matthew agreed. Zepeda then called another of his brothers, Jeremy,

and asked if he wanted to go to the party. Jeremy also agreed.

An unidentified driver picked up Zepeda, Matthew, and Jeremy. Zepeda told the driver to take them to a house located on the Ak-Chin Reservation. The house belonged to Dallas Peters and his wife, Jennifer Davis. Zepeda wanted to see his ex-girlfriend, Stephanie Aviles, who was at Peters's house with her sixteen-year-old cousin, "C".

In the car, Zepeda and his brothers drank beer and smoked marijuana. Matthew and Jeremy still thought they were going to a party. The driver dropped them off near Peters's house. Matthew testified at trial that Zepeda told Jeremy to "grab something from the seat." Jeremy "wasn't paying attention," so Matthew reached under the car seat and pulled out a shotgun. Jeremy testified that Zepeda got out of the car holding a handgun and a shotgun, and that Zepeda tried to give the shotgun to Jeremy. When Jeremy refused, Zepeda gave the shotgun to Matthew. Zepeda told Matthew to fire the shotgun if he heard shots.

Matthew and Jeremy walked to the west side of Peters's house, and Zepeda approached the front door. Jeremy testified that he saw Zepeda carrying a handgun. At this point, Jeremy testified, he realized they were not at a party. Jeremy walked away toward the main road because he did not want to "get involved with something that . . . [was] going to jeopardize me and my family." Matthew stayed by the side of the house with the shotgun.

Zepeda knocked on the front door, and Peters answered. Zepeda asked to talk to Aviles, who came outside and walked with Zepeda to the northeast corner of the house. Zepeda

asked Aviles to leave with him. When she refused, he grabbed her arms. She tried to push him away and felt what she thought was a gun in his pocket. From inside the house, C heard Zepeda and Aviles "getting louder," and she went outside to check on Aviles. Aviles turned around to return to the house, and Zepeda hit her in the head multiple times with something hard. Aviles fell face-down on the ground.

Zepeda pulled out a handgun and pointed it at C. She ran away down the east side of the house. She heard gunshots. Peters, who was urinating off his back porch at the time, heard the gunshots and walked to the southeast corner of the house. He saw C running toward him. He "grabbed her, pulled her in, like [to] shield her." While holding C, Peters was shot in the shoulder. He testified, "I didn't feel the round, but I seen blood come out so I knew I had to be shot." C testified that she saw Zepeda shooting from about forty feet away. "[T]he shooting kept going and going," she testified. "I had blood all on my back and I thought I got shot and Dallas said, 'You're okay. Just—I got shot. Just run. Please just run.'" She ran to the back door of the house and went inside.

At about the time Zepeda started shooting, Matthew fired the shotgun toward the backyard. Matthew then walked into the backyard and fired the shotgun in Peters's direction. Matthew testified that he did not see Peters when he fired the shotgun. Peters tried to run toward the front of the house, but he "hear[d] shots going past [his] ears from that way." He saw Matthew "fiddling [with the gun] with it pointed down." Peters ran toward Matthew and tried, unsuccessfully, to disarm him.

Peters returned to the southeast corner of the house, where he saw Zepeda. Zepeda had lowered his gun, either because it had jammed or because he was reloading. Peters "rush[ed]" at Zepeda and "grabbed the gun." Peters pulled the trigger around twelve times to "get rid of the bullets." After the gun was empty, Peters let go. Zepeda ran to the west side of the house. He caught up with Matthew and Jeremy, and the three men fled.

After the shooting started, Aviles stood up and ran into the house. According to C,

> [Aviles] was crying and she asked what happened and where Dallas was and if everybody was in the house and if we were all okay. And we ran to the hallway where Jennifer was, Dallas's wife, and she was crying. And the whole time we were in there we could hear gunshots.

> We stood in the hallway for probably around ten minutes until the doorbell kept ringing . . . and Jennifer finally went and opened the door and Dallas came inside and collapsed on the floor and he was covered in blood.

Peters was severely injured in the shooting. He had numerous gunshot wounds, including life-threatening wounds to his wrist and upper thigh. He had many small buckshot wounds in his torso. He spent more than a month in the hospital and underwent more than eight surgeries.

The government charged Zepeda, Matthew, and Jeremy in connection with the shooting.  Matthew pled guilty to assault resulting in serious bodily injury and to use of a firearm during a crime of violence.  Jeremy pled guilty to misprision of a felony.  The government charged Zepeda with nine counts: (1) one count of conspiracy to commit assault with a dangerous weapon and to commit assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153, 371, and 2; (2) one count of assault resulting in serious bodily injury against Peters, in violation of 18 U.S.C. §§ 1153, 113(a)(6), and 2; (3) three counts of assault with a dangerous weapon against Peters, Aviles, and C, in violation of 18 U.S.C. §§ 1153, 113(a)(6), and 2; and (4) four counts of use of a firearm during a crime of violence against Peters, Aviles, and C, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2.  Zepeda went to trial on all nine counts.

To prove that Zepeda was an Indian within the meaning of the IMCA, the government introduced into evidence a document titled "Gila River Enrollment/Census Office Certified Degree of Indian Blood" ("Enrollment Certificate"). Detective Sylvia Soliz, a detective for the Ak-Chin Police Department, testified that an Enrollment Certificate is "a piece of paper confirming through the tribe that . . . this person is an enrolled member of their tribe and . . . meet[s] the blood quantum."  She testified that enrollment certificates may be used to determine whether a person is eligible to receive benefits, such as housing and medical care, from the tribe.  The government and Zepeda's attorney stipulated that the Enrollment Certificate "may be presented at trial without objection," and that its "contents are stipulated to as fact."

Zepeda's Enrollment Certificate stated that Zepeda was "an enrolled member of the Gila River Indian Community."

It listed Zepeda's "blood degree" as one-fourth Pima and one-fourth Tohono O'Odham, for a total of one-half Indian blood. Matthew also testified about Zepeda's Indian status. He testified that Zepeda is half Indian, with blood from the "Pima and Tiho" tribes. (Matthew may have said "T.O.," for Tohono O'Odham, which was then transcribed as "Tiho.") Matthew testified that Zepeda also is "at least half Native American." He testified that his own Indian heritage comes from his father, and that he and Zepeda have the same father and mother.

At the close of the government's case-in-chief, Zepeda moved for a judgment of acquittal because of insufficient evidence. The district court denied the motion. Zepeda renewed his motion at the close of evidence, and the district court again denied it. The court instructed the jury that, in order to convict, it needed to find that Zepeda was an Indian. The court did not instruct the jury how to make that finding. Neither the government nor Zepeda's lawyer objected to this instruction or requested that the court provide the jury with more information about making the finding of Indian status.

The jury convicted Zepeda on all counts. The district court sentenced Zepeda to a prison term of ninety years and three months. Zepeda appealed, challenging his convictions and sentence on a number of separate grounds. A three-judge panel of this court affirmed Zepeda's conviction for conspiracy and reversed his convictions on the other eight counts. *United States v. Zepeda*, 738 F.3d 201, 214 (9th Cir. 2013); *United States v. Zepeda*, 506 F. App'x 536, 537–38 (9th Cir. 2013). The panel held that the government introduced insufficient evidence to support the jury's finding that Zepeda was an Indian. *Zepeda*, 738 F.3d at 213. It rejected all of Zepeda's other arguments challenging his

convictions. *Id.* at 208; *Zepeda*, 506 F. App'x at 538–39. It did not reach Zepeda's argument that his sentence was unreasonable.

We granted rehearing en banc. *United States v. Zepeda*, 742 F.3d 910 (9th Cir. 2014).

## II.  Discussion

In this opinion, we address only Zepeda's arguments (1) that the government's evidence was insufficient to support a jury finding that he was an Indian within the meaning of the IMCA, and (2) that his sentence was unreasonable. We agree with the three-judge panel's reasons for rejecting Zepeda's other arguments, and we adopt them as our own. *See Zepeda*, 738 F.3d at 207–08; *Zepeda*, 506 F. App'x at 538–39.

### A.  Sufficiency of the Evidence to Prove Indian Status

#### 1.  Indian Status Under the IMCA

The IMCA is one of several statutes addressing "[t]he exercise of criminal jurisdiction over Indians and Indian country." *Bruce*, 394 F.3d at 1218. In its current form, the IMCA authorizes federal criminal jurisdiction over

> [a]ny Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson,

burglary, robbery, and a felony under section
661 of this title within the Indian country.

18 U.S.C. § 1153(a). Under the IMCA, "the defendant's
Indian status is an essential element . . . which the
government must allege in the indictment and prove beyond
a reasonable doubt." *Bruce*, 394 F.3d at 1229.

As we noted in *Bruce*, the IMCA does not define
"Indian," but "courts have 'judicially explicated' its
meaning." *Id.* at 1223 (quoting *United States v. Broncheau*,
597 F.2d 1260, 1263 (9th Cir. 1979)). We wrote that "[t]he
generally accepted test for Indian status" under the IMCA
considers "'(1) the degree of Indian blood; and (2) tribal or
government recognition as an Indian.'" *Id.* (quoting *United
States v. Keys*, 103 F.3d 758, 761 (9th Cir. 1996)); *see*
William C. Canby, Jr., *American Indian Law in a Nutshell*
9–10 (5th ed. 2009); *see also United States v. Cruz*, 554 F.3d
840, 845–46 (9th Cir. 2009) (quoting the *Bruce* test). We
understand *Bruce*'s second prong, "tribal or government
recognition as an Indian," to require "membership or
affiliation in any federally acknowledged Indian tribe."
*LaPier v. McCormick*, 986 F.2d 303, 306 (9th Cir. 1993).

The two-prong *Bruce* test requires that, in addition to
affiliation with a federally recognized tribe, as specified in
the second prong, a defendant subject to the IMCA must also
have some quantum of Indian blood, as specified in the first
prong. That is, the defendant must have a blood connection
to a "once-sovereign political communit[y]." *United States
v. Antelope*, 430 U.S. 641, 646 (1977). "The first prong
requires ancestry living in America before the Europeans
arrived." *Bruce*, 394 F.3d at 1223. Affiliation with a
federally recognized tribe is relevant only to *Bruce*'s second

prong.  The federally recognized tribe with which a defendant is currently affiliated need not be, and sometimes is not, the same as the tribe or tribes from which his bloodline derives. Indeed, in this very case, Zepeda's Enrollment Certificate states that he is a member of the Gila River Indian Community, but it lists his blood as deriving from the Pima and Tohono O'Odham tribes.

Five years after *Bruce*, and after trial in this case, we added a gloss to the *Bruce* test, based on a broad application of the premise that Indian status requires "a sufficient connection to an Indian tribe that is *recognized by the federal government*." *Maggi*, 598 F.3d at 1078.  We held in *Maggi* that the tribal federal-recognition requirement applies in both prongs of the *Bruce* test.  *Id.* at 1080–81.  Accordingly, we held that the first *Bruce* prong requires that the defendant's "bloodline be derived from a federally recognized tribe," *id.* at 1080, and that the second prong requires "membership or affiliation with a federally recognized tribe," *id.* at 1081 (internal quotation marks omitted).  Zepeda argues under *Maggi* that the government's evidence under the first prong was insufficient to prove that his bloodline derives from a federally recognized tribe.

Under *Bruce*, the governing law at the time of Zepeda's trial, there was no requirement that an Indian defendant's blood be traceable to a federally recognized tribe.  Relying on *Bruce*, and not anticipating the yet-undecided *Maggi*, the government did not present evidence that Zepeda's Indian blood derived from a member of a federally recognized tribe. However, its undisputed evidence showed conclusively that Zepeda had some quantum of Indian blood.  We need not reach the question whether Zepeda is right that the government did not introduce sufficient evidence to satisfy

the definition of "Indian" under *Maggi*, for we are convinced that *Maggi* was wrongly decided.

*Maggi* drew its federal-recognition requirement from our decision in *LaPier v. McCormick*. The defendant in *LaPier* was convicted in state court for crimes that occurred within the Blackfeet Indian Reservation. 986 F.2d at 304. He filed a petition for habeas corpus, arguing that he was an Indian and thus should have been tried in federal court under the IMCA. *Id.* We rejected his argument, but we did not address whether he had "shown a significant degree of blood and sufficient connection to his tribe." *Id.* Instead, we held that he lost under "a simpler threshold question," whether "the Indian group with which [he] claim[ed] affiliation [was] a federally acknowledged Indian tribe." *Id.* at 304–05. Because the tribe in which he was enrolled was not federally recognized, we held that he was not an Indian under the IMCA. *Id.* at 306.

*Maggi* read *LaPier* to require federal recognition under both prongs of the *Bruce* test. But *LaPier* required federal recognition only under *Bruce*'s second prong. The "dispositive" question in *LaPier* was whether "the Indian group with which LaPier *claims affiliation* [is] a federally acknowledged Indian tribe." *Id.* at 304–05 (emphasis added). We wrote that a "defendant whose only claim of *membership or affiliation* is with an Indian group that is not a federally acknowledged Indian tribe cannot be an Indian for criminal jurisdiction purposes." *Id.* at 305 (emphasis added). *LaPier*'s discussion of federal recognition thus focused exclusively on the particular tribe with which the defendant was currently affiliated. *See id.* at 304–05.

Zepeda contends that *Maggi* was correctly decided. He argues, based on *United States v. Antelope*, 430 U.S. 641 (1977), that if the first prong of the *Bruce* test requires only a quantum of Indian blood, without any connection under this prong to a federally recognized tribe, jurisdiction under the IMCA will depend upon a racial rather than a political classification. We disagree. We see nothing inconsistent between the Court's holding in *Antelope* and our holding here that the first prong of the *Bruce* test does not require that the quantum of blood be derived from a member of a federally recognized tribe. We do not concede that a requirement of Indian blood standing alone is necessarily a racial rather than a political classification. *See, e.g.*, 25 U.S.C. § 479 (defining the term "Indian" in the Indian Reorganization Act to include "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation," and "*further includ[ing] all other persons of one-half or more Indian blood*") (emphasis added)); *id*. § 1679(a)(2) (defining "eligible" "Indians" to include members of non-federally recognized tribes so long as the person can demonstrate descent from an Indian resident in California as of 1852); *id*. § 500n (defining "natives of Alaska" as "native Indians, Eskimos, and Aleuts of whole or part blood inhabiting Alaska at the time of the Treaty of Cession of Alaska to the United States and their descendants of whole or part blood"); 25 C.F.R. § 83.7(e) (to be eligible for federal acknowledgment, a tribe must demonstrate, among other things, that its membership "consists of individuals who descend from a historical Indian tribe"). But even if it were, the second prong of the *Bruce* test, as understood in *Maggi* and as we understand it now, is enough to ensure that Indian status is not a racial classification, for the second prong

requires, as a condition for the exercise of federal jurisdiction, that the defendant be a member of or be affiliated with a federally recognized tribe. *See Bruce*, 394 F.3d at 1224 (noting that the second prong requires a "non-racial link" to a tribe); *LaPier*, 986 F.2d at 305.

In *Antelope*, the Indian defendants had been convicted of first-degree felony murder under the IMCA. 430 U.S. at 642–43. If they had been tried under Idaho law, the prosecution would have had to prove additional elements of premeditation and deliberation, because Idaho law lacked an applicable felony-murder provision. *Id*. at 643–44. The Ninth Circuit held that the disadvantage imposed on defendants under the IMCA violated equal protection because "the *sole* basis for the disparate treatment of appellants and non-Indians is that of race." *United States v. Antelope*, 523 F.2d 400, 403 (9th Cir. 1975) (emphasis in original). The Supreme Court reversed. It held that the IMCA was "not based upon impermissible [racial] classifications." *Antelope*, 430 U.S. at 646. "Federal regulation of Indian tribes," the Court wrote, "is governance of once-sovereign political communities; it is not to be viewed as legislation of a 'racial group consisting of Indians.'" *Id.* (quoting *Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974) (some internal quotation marks omitted)).

Neither the Ninth Circuit nor the Supreme Court in *Antelope* defined "Indian" under the IMCA. However, we know from the Court's analysis that the definition required at least an affiliation with a federally recognized tribe. *Id*. at 646 ("[R]espondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe."). Neither the Ninth Circuit nor the Court specified whether the

definition required, in addition, a quantum of Indian blood. We may infer, however, that such an additional requirement would not have made any difference to the Court's analysis, for the Court premised its analysis on *Mancari*, in which the definition of Indian specifically included a requirement of a quantum of Indian blood.

In *Mancari*, decided just three years before *Antelope*, non-Indian employees of the Bureau of Indian Affairs ("BIA") challenged the employment preference given to Indians under the so-called Indian Preference Statutes. 417 U.S. at 537. The term "Indian" is defined variously in federal and state statutes. Many federal definitions include a requirement of some "quantum" of Indian blood. *See* Paul Spruhan, *A Legal History of Blood Quantum in Federal Indian Law to 1935*, 51 S.D. L. Rev. 1 (2006); Margo S. Brownell, Note, *Who Is an Indian? Searching for an Answer to the Question at the Core of Federal Indian Law*, 34 U. Mich. J.L. Reform 275 (2000–2001). The definition of "Indian," for purposes of the Indian employment preference at issue in *Mancari*, specified that "an individual must be one-fourth or more degree Indian blood and be a member of a Federally-recognized tribe." 417 U.S. at 553 n.24. The Court upheld the Indian employment preference, with "Indian" so defined, writing:

> Literally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA, single out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United

States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.

*Id.* at 552; *see Antelope*, 430 U.S. at 645 (quoting most of this passage); *see also* Sarah Krakoff, *Inextricably Political: Race, Membership, and Tribal Sovereignty*, 87 Wash. L. Rev. 1041 (2012); Spruhan, *supra*.

It might be objected that the rationale of *Mancari* does not apply to the IMCA, given that *Mancari* deals with disproportionate benefits provided to Indians while the IMCA, at least in some of its applications, deals with disproportionate burdens imposed on Indians. But the Court in *Antelope* specifically responded to this objection. It wrote:

Both *Mancari* and *Fisher* [*v. District Court*, 424 U.S. 382 (1976),] involved preferences or disabilities directly promoting Indian interests in self-government, whereas in the present case we are dealing, not with matters of tribal self-regulation, but with federal regulation of criminal conduct within Indian country implicating Indian interests. But the principles reaffirmed in *Mancari* and *Fisher* point more broadly to the conclusion that federal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as "a separate people" with their own political institutions.

430 U.S. at 646.

The gloss added by *Maggi* to the first prong of *Bruce* would impose an unnecessary and burdensome requirement. Under *Maggi*, the government would have to prove that an ancestor of the defendant—not merely the defendant himself or herself—was a member of a federally recognized tribe. Such proof is unnecessary, given that the political status necessary to insulate a prosecution under the IMCA from an equal protection challenge is established, under any conception of Indian political status, under the second prong of *Bruce*.  Further, such proof may be difficult or even impossible to obtain, even if it is undisputed that the defendant has Indian blood.  In some cases, evidence about the defendant's Indian ancestors and their tribal affiliation may be difficult to find or, if found, ambiguous.  In other cases, the evidence may be easily available and clear, but show that the Indian ancestors were not members of a federally recognized tribe.

We therefore overrule *Maggi* and restore the basic structure of *Bruce*, though not its precise articulation, as the "generally accepted test for Indian status" under the IMCA. *Bruce*, 394 F.3d at 1223.  In doing so, we recognize that *Maggi* was right to restate the second prong of the *Bruce* test and to make clear that the defendant must have a current relationship with a federally recognized tribe.  We hold that proof of Indian status under the IMCA requires only two things: (1) proof of some quantum of Indian blood, whether or not that blood derives from a member of a federally recognized tribe, and (2) proof of membership in, or affiliation with, a federally recognized tribe.

In a prosecution under the IMCA, the government must prove that the defendant was an Indian at the time of the offense with which the defendant is charged.  If the relevant

time for determining Indian status were earlier or later, a defendant could not "predict with certainty" the consequences of his crime at the time he commits it. *Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000). Moreover, the government could never be sure that its jurisdiction, although proper at the time of the crime, would not later vanish because an astute defendant managed to disassociate himself from his tribe. This would, for both the defendant and the government, undermine the "notice function" we expect criminal laws to serve. *United States v. Francisco*, 536 F.2d 1293, 1296 (9th Cir. 1976).

Zepeda and the government agree that the government has the burden of proving to a jury that the defendant was a member of, or affiliated with, a federally recognized tribe at the time of the offense. However, they dispute whether the judge or the jury should determine whether the tribe in question is federally recognized. Federal recognition "is a formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government." Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 3.02[3], at 134–35 (Nell Jessup Newton ed., 2012); *see* 25 C.F.R. § 83.2. The BIA has the authority to determine which tribes satisfy the criteria for federal recognition. *Zepeda*, 738 F.3d at 211. It maintains and publishes annually a list of federally recognized tribes. *See, e.g.*, Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs ("BIA List"), 75 Fed. Reg. 60,810-01 (Oct. 1, 2010). "Absent evidence of its incompleteness, the BIA list appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry." *LaPier*, 986 F.2d at 305. We

previously have treated federal recognition of Indian tribes as a question of law. In *LaPier*, we held as a matter of law that the defendant's tribe was not federally recognized because it did not appear on the BIA List. *Id*. at 306. Similarly, in *United States v. Heath*, 509 F.2d 16, 19 (9th Cir. 1974), we held as a matter of law that the defendant's tribe was not federally recognized because the federal government had terminated the tribe's recognized status. Consistent with these cases, we hold that federal recognition of a tribe, a political decision made solely by the federal government and expressed in authoritative administrative documents, is a question of law to be decided by the judge.

In seeking to prove federal recognition of a defendant's tribe, the government should present to the judge evidence that the tribe was recognized at the time of the offense. In most cases, the judge will be able to determine federal recognition by consulting the relevant BIA List. If necessary to decide whether the BIA List omits a federally recognized tribe or includes an unrecognized tribe, the court may consult other evidence that is judicially noticeable or otherwise appropriate for consideration.

On the first *Bruce* prong, the court should instruct the jury that it has to find beyond a reasonable doubt that the defendant has some quantum of Indian blood. On the second prong, the court should instruct the jury that it has to find beyond a reasonable doubt that the defendant was a member of, or affiliated with, a federally recognized tribe at the time of the offense. We described in our opinion in *Bruce* the criteria for such recognition. *Bruce*, 394 F.3d at 1224; *see also Cruz*, 554 F.3d at 846. We restate them here, emphasizing that each of these criteria requires a link to a federally recognized tribe. The criteria are, in declining order

of importance: (1) enrollment in a federally recognized tribe; (2) government recognition formally and informally through receipt of assistance available only to individuals who are members, or are eligible to become members, of federally recognized tribes; (3) enjoyment of the benefits of affiliation with a federally recognized tribe; (4) social recognition as someone affiliated with a federally recognized tribe through residence on a reservation and participation in the social life of a federally recognized tribe. If the court has found that the tribe of which the government claims the defendant is a member, or with which the defendant is affiliated, is federally recognized, it should inform the jury that the tribe is federally recognized as a matter of law.

Here, the trial court erred by instructing the jury to find whether Zepeda was an Indian without telling it how to make that finding. Zepeda did not object to the instruction, so we review for plain error. *United States v. Williams*, 990 F.2d 507, 511 (9th Cir. 1993). "Plain error is '(1) error, (2) that is plain, and (3) that affects substantial rights.'" *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc) (quoting *United States v. Cotton*, 535 U.S. 625, 631 (2002)). The erroneous jury instruction did not affect Zepeda's substantial rights because, as we discuss below, there was clear and undisputed evidence that Zepeda both had Indian blood and was an enrolled member of a federally recognized tribe. *See United States v. Teague*, 722 F.3d 1187, 1192 (9th Cir. 2013) (noting that "failure to instruct on a necessary offense element" does not affect substantial rights where "there is [no] reasonable probability the jury's verdict would have been different had the jury been properly instructed" (internal quotation marks omitted)).

2.  Sufficiency of the Evidence Against Zepeda

Zepeda argues the government failed to present sufficient evidence at trial to prove that he was an Indian.  If Zepeda is right, we must reverse eight of his nine convictions.  The government charged Zepeda with assault with a dangerous weapon and assault resulting in serious bodily harm under the IMCA.  *See* 18 U.S.C. § 1153 (covering "felony assault[s] under section 113"); 18 U.S.C. §§ 113(3), (6).  Conspiracy and use of a firearm during a crime of violence are "federal law[s] of general, non-territorial applicability," which do not require the government to satisfy the IMCA's elements. *United States v. Errol D., Jr.*, 292 F.3d 1159, 1165 (9th Cir. 2002) (quoting *United States v. Young*, 936 F.2d 1050, 1055 (9th Cir. 1991)).  However, to prove that Zepeda used a firearm during a crime of violence, the government first had to prove that Zepeda committed the predicate assaults, *United States v. Streit*, 962 F.2d 894, 899 (9th Cir. 1992), which were charged under the IMCA.  Therefore, conspiracy was the only count for which the government did not have to prove Zepeda's Indian status.

The first prong of the *Bruce* test requires only that the defendant have "some" quantum of Indian blood.  Therefore, "evidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong." *Bruce*, 394 F.3d at 1223.  The Enrollment Certificate stated that Zepeda had one-half Indian blood, with blood from the Pima and Tohono O'Odham tribes.  Matthew, Zepeda's brother, testified that their father was an Indian. This evidence was undisputed and clearly satisfied the first *Bruce* prong.  *See id.* at 1223–24.  As we held above, it is irrelevant whether the tribes from which Zepeda's bloodline derives are federally recognized.

Zepeda's Enrollment Certificate established that he was an enrolled member of the Gila River Indian Community. The Gila River Indian Community was, as a matter of law, a federally recognized tribe at the time of the charged offenses. *See* BIA List, 74 Fed. Reg. 40,218-02, 40,220 (Aug. 11, 2009); BIA List, 73 Fed. Reg. 18,553-01, 18,554 (Apr. 4, 2008). Zepeda stipulated to the admission of the Enrollment Certificate and did not challenge its attestation that he was a member of the Gila River Indian Community.

We therefore hold that the Enrollment Certificate and Matthew's testimony were sufficient to establish that Zepeda was an Indian at the time of the charged offenses.

## B.  Zepeda's Sentence

Zepeda argues that his sentence—a prison term of ninety years and three months—was unreasonable because the district court improperly treated the Sentencing Guidelines as mandatory.  Zepeda's sentence is indeed long, but his argument is based on a misunderstanding of the law governing his sentence.

Under 18 U.S.C. § 924(c), the district court was required to impose consecutive mandatory minimum sentences on Zepeda's convictions for use of a firearm during a crime of violence.  Each of Zepeda's convictions under § 924(c) was tied to a different predicate offense: one count of assault resulting in serious bodily injury against Peters and three counts of assault with a dangerous weapon against Peters, Aviles, and C.  The jury found that Zepeda discharged his firearm in committing each offense. Therefore, Zepeda's first conviction under § 924(c) carried a statutory mandatory minimum sentence of ten years, 18 U.S.C. § 924(c)(1)(A)(iii),

and the other three convictions each carried statutory mandatory minimum sentences of twenty-five years, *id.* § 924(c)(1)(C)(i); *see United States v. Beltran-Moreno*, 556 F.3d 913, 915 (9th Cir. 2009). Each mandatory minimum sentence had to be imposed consecutively. 18 U.S.C. § 924(c)(1)(D)(ii); *Beltran-Moreno*, 556 F.3d at 915. Therefore, Zepeda's sentence is the only sentence the district court could impose. *See United States v. Harris*, 154 F.3d 1082, 1085 (9th Cir. 1998). Its length was determined not by the judge but, in effect, by the United States Attorney's charging decision. Zepeda's other arguments challenging his sentence were not properly raised before this court. *See Sandgathe v. Maass*, 314 F.3d 371, 380 & n.8 (9th Cir. 2002); 9th Cir. R. 28-1(b).

## Conclusion

We overrule *Maggi* and hold that the government's evidence was sufficient under the *Bruce* test, as recharacterized in this opinion, to prove that Zepeda was an Indian at the time of his crimes. We reject Zepeda's other arguments and affirm his convictions and sentence in full.

**AFFIRMED.**

KOZINSKI, Circuit Judge, with whom Circuit Judge IKUTA joins, concurring in the judgment:

The majority's holding transforms the Indian Major Crimes Act into a creature previously unheard of in federal law: a criminal statute whose application turns on whether a defendant is of a particular race. Damien Zepeda will go to prison for over 90 years because he has "Indian blood," while an identically situated tribe member with different racial characteristics would have had his indictment dismissed. It's the most basic tenet of equal protection law that a statute which treats two identically situated individuals differently based solely on an unadorned racial characteristic must be subject to strict scrutiny. The racial test articulated in *United States* v. *Bruce*, 394 F.3d 1215 (9th Cir. 2005), amounts to an unwarranted and impermissible "Indian exception" to that bedrock principle.

*United States* v. *Maggi* at least tethered *Bruce*'s racial component to a political relationship. 598 F.3d 1073, 1080–81 (9th Cir. 2010). By overruling *Maggi*, the majority leaves the IMCA—and a host of other federal statutes governing tribes—shorn of even a colorable non-racial underpinning. I would instead affirm Zepeda's conviction either by applying the IMCA to all members of federally recognized tribes irrespective of their race, or by holding, consistent with *Maggi*, that the jury had sufficient evidence to infer Zepeda's ancestry was from a federally recognized tribe. I concur in the judgment only.

**1.** The majority holds "that proof of Indian status . . . requires only two things: (1) proof of some quantum of Indian blood, whether or not that blood derives from a member of a federally recognized tribe, and (2) proof of membership in, or

affiliation with, a federally recognized tribe." Maj. Op. at 20. The first prong of that test is an overt racial classification. The majority is unconcerned by this because, in its view, "[t]he second prong of the *Bruce* test . . . is enough to ensure that Indian status is not a racial classification, for the second prong requires, as a condition for the exercise of federal jurisdiction, that the defendant be a member of or be affiliated with a federally recognized tribe." Maj. Op. at 16–17.

But the presence of a separate and independent "non-racial prong" cannot save a test that otherwise turns on race. *Bruce*'s political affiliation prong may provide a non-racial basis for limiting the IMCA only to tribe members. But not all tribe members are subject to the IMCA. Separating those who are from those who are not is the function of *Bruce*'s first requirement, and that requirement turns entirely on race. That ineluctably treats identically situated individuals *within* a tribe differently from one another solely based on their immutable racial characteristics.

To claim that the *Bruce* test is "not a racial classification" because there's a non-racial "condition for the exercise of federal jurisdiction" conflates Congress's Article I power to enact a law with the affirmative restrictions imposed by the Fifth Amendment. The fact that the "defendant [is] a member of or [] affiliated with a federally recognized tribe" explains why Congress is able to criminalize a tribe member's conduct, even absent a nexus to interstate activity. But the fact that Congress is permitted to create laws regulating tribe members doesn't mean that Congress can administer those laws in a discriminatory fashion. That would be like saying a federal law extending criminal penalties only to those with "African blood" isn't a racial classification because it can only be applied to people who engage in interstate commerce.

"[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 224 (1995). Indians are no exception. The Supreme Court has stressed time and again that federal regulation of Indian *tribes* does not equate to federal regulation of the Indian *race*. Federal laws governing tribes do "not derive from [] race . . . but rather from [a tribe's] quasi-sovereign status . . . under federal law." *Fisher* v. *District Court*, 424 U.S. 382, 390 (1976) (per curiam). "[R]egulation is rooted in the unique status of Indians as [a nation] with their own political institutions . . . [and] is not to be viewed as legislation of a 'racial group consisting of Indians.'" *United States* v. *Antelope*, 430 U.S. 641, 646 (1977) (quoting *Morton* v. *Mancari*, 417 U.S. 535, 553 n.24 (1974)). In fact, the Supreme Court has specifically stated that defendants are "not subjected to federal criminal jurisdiction [under the IMCA] because they are of the Indian race but because they are enrolled members of [a federally recognized] tribe." *Id.* Taken together, *Antelope* and *Mancari* stand for the proposition that Congress can enact laws that treat members of federally recognized tribes differently from non-members so long as that disparate treatment occurs along political rather than racial lines. That holding cannot be reconciled with the holding here, which leaves Congress free to enact any law that racially discriminates between individuals within a tribe.

**2.** The panel in *Bruce* believed itself bound to apply a racial test because of the Supreme Court's decision in *United States* v. *Rogers*, 45 U.S. (4 How.) 567 (1846). *Rogers* is a nearly 170-year-old case, authored by Chief Justice Taney, in which the Court held that an adopted, non-racially Indian

tribe member wasn't subject to an exemption from federal criminal jurisdiction for crimes committed by an "Indian" against another "Indian." *Id.* at 572–73. In defining "Indian" for purposes of the statute, the Court noted that the law "does not speak of members of a tribe, but of the race generally,—of the family of Indians," *id.* at 573, and justified the federal government's exercise of power over "this unfortunate race" in part based on the need "to enlighten their minds and increase their comforts, and to save them if possible from the consequences of their own vices," *id.* at 572.

Reliance on pre-civil war precedent laden with dubious racial undertones seems an odd course for our circuit law to have followed, especially in light of the Supreme Court's much more recent holdings in *Mancari* and *Antelope*. And, even if intervening developments in equal protection law hadn't rendered *Rogers* obsolete, it's clearly distinguishable. *Rogers* stands for the limited proposition that "a white man who at mature age is adopted in an Indian tribe does not thereby become an Indian," 45 U.S. (4 How.) at 572, when the adoption occurs for the purpose of evading prosecution. A case that does no more than prohibit a tribe from making membership exceptions designed to circumvent criminal punishment is a weak reed upon which to rest the federal government's unfettered ability to racially discriminate between tribe members.

The majority's strongest support for *Bruce*'s racial test appears to be an inference from the fact that the racial preference upheld in *Mancari* had a blood quantum requirement similar to the one at issue here. But that portion of the provision in *Mancari* wasn't challenged by plaintiffs, nor was there any assertion that the hiring preference in that

case discriminated *among* tribe members.   Rather, the grievance in *Mancari* was that non-tribe members were discriminated against by the preferential hiring of tribe members. The constitutionality of *that* distinction was upheld because the preference was given to "tribal entities," not to a "racial group."  I find it remarkable that the majority is able to read a case that upholds tribal preferences only so long as they are non-racial as a broad endorsement of the government's power to racially distinguish between those within a tribe.

**3.**  Overruling *Maggi* takes our circuit law in the wrong direction.  *Maggi* at least tied the racial component in *Bruce* to a political relationship.  Because Congress's plenary power over Indian tribes is rooted in treaties and other political accommodations between sovereign entities, the validity of federal regulation must turn, not on a tribe's existence in some anthropological sense, but on its political relationship with the United States.   A genuine political relationship between sovereigns requires reciprocal recognition.  Thus, as we correctly noted in *LaPier* v. *McCormick*, a political relationship between a tribe and the federal government exists only when "the United States recognizes [the] tribe." 986 F.2d 303, 305 (9th Cir. 1993).  That's why the Court in *Mancari* specifically noted Congress has the power "to legislate on behalf of *federally recognized* Indian tribes," 417 U.S. at 551 (emphasis added), not merely "tribes."

*Maggi* ensured that we tied *Bruce*'s racial component to this political relationship.  Regulation was rooted in a racial connection to an established political entity, rather than in an unadorned racial characteristic. *Maggi* was less than perfect, of course.  At bottom, a racial distinction still controlled the application of federal law.  But at least the racial lineage in

question bore some relation to the purported source of federal power. An unrecognized tribe is not a quasi-sovereign political entity for the purposes of federal law, and has no political relationship whatsoever with the United States. To allow a federal statute to turn solely on a racial connection to an unrecognized tribe has no basis in the justification for disparate treatment articulated in *Mancari* and *Antelope*.

*          *          *

By extending *Bruce* and overruling *Maggi*, the majority creates a disturbing anomaly in the application of our equal protection law. The majority empowers Congress to distribute benefits and burdens within Indian tribes along purely racial lines. It may be that Congress will never use that power to work racial injustice, but the Constitution's commands are inexorable precisely because we aren't prescient enough to predict all the ways in which the government can abuse the power we give to it. Whatever complexities may be inherent in the federal regulation of Indian tribes, the equal protection clause permits no exceptions. Racial classifications must survive the strictest scrutiny. Those that cannot have no place in our law.

IKUTA, Circuit Judge, with whom KOZINSKI, Circuit Judge, joins, concurring in the judgment:

The majority today holds that we must continue to define an Indian by the "degree of Indian blood" as required by *United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005). Maj. Op. at 13–14. This is a troubling conclusion, and an unnecessary one. The *Bruce* blood quantum requirement serves no purpose, because the second prong of the *Bruce* test adequately defines an Indian based on his "tribal or government recognition as an Indian." *Bruce*, 394 F.3d at 1223 (internal quotation mark omitted). In holding that a person is not an Indian unless a federal court has determined that the person has an acceptable Indian "blood quantum," we disrespect the tribe's sovereignty by refusing to defer to the tribe's own determination of its membership rolls. It's as if we declined to deem a person to be a citizen of France unless that person can prove up a certain quantum of "French blood," and we declared that adoptees whose biological parents are Italian cannot qualify.

Because there is no need to use the blood quantum test in this context, we should avoid perpetuating the sorry history of this method of establishing a race-based distinction. Early in our history, state courts used blood quantum tests to determine who was a slave and who was free. *See Gentry v. McMinnis*, 33 Ky. (3 Dana) 382, 385 (1835) (explaining that "[a]ll persons of blood not less than one-fourth African, are (in Virginia and Kentucky) prima facie deemed slaves; and, e converso, whites and those less than one-fourth African, are, prima facie, free"). Even after slavery was abolished, states used blood quantum tests to define "persons of color" and to ensure segregation of "persons of color" from white persons. *See, e.g.*, 1 Pope's Digest of Stats. of Ark. § 1200

(1937) (defining persons who "belong to the African race," for the purposes of railroad segregation, as "[p]ersons in whom there is a visible and distinct admixture of African blood"); Ga. Code Ann. § 79-103 (1933) (defining "persons of color" as persons who have "any ascertainable trace" of colored blood); Va. Code Ann. § 67 (Michie 1924) (defining a "colored person" as a person "having one-sixteenth or more of negro blood" and "an Indian" as a non-colored person with one-fourth Indian blood). And the same blood quantum tests determined who could vote. *See People v. Dean*, 14 Mich. 406, 413–15, 425 (1866) (construing state law giving only "white male citizens" the right to vote as excluding persons of African descent unless they had less than one-fourth African blood).

Similarly, states relied on blood quantum tests to prevent white people from marrying persons of color. *See Loving v. Virginia*, 388 U.S. 1, 6 (1967). *Loving* finally invalidated Virginia's miscegenation laws, which prohibited intermarriage between white persons and nonwhites, and explained that the term "white person" applied "only to such person as has no trace whatever of any blood other than Caucasian; but persons who have one-sixteenth or less of the blood of the American Indian and have no other non-Caucasic blood shall be deemed to be white persons." *Id.* at 5 n.4, 12 (quoting Va. Code Ann. § 20–54 (1960)).

Our nation also used blood quantum tests to discriminate against nonwhites who wanted to become citizens. Congress decreed that only a "free white person[]" could be granted the "privilege of naturalization," and courts generally construed this requirement to mean that "men are not white if the strain of colored blood in them is a half or a quarter, or, not improbably, even less, the governing test always being that of

common understanding." *Morrison v. California*, 291 U.S. 82, 85–86 (1934) (internal citation and quotation marks omitted); *see also* 8 U.S.C. § 703 (1940) (extending the right to be a naturalized citizen only to persons with an approved admixture of blood of specified classes). In ten states, only persons who met the blood quantum requirement for naturalization could own land. *See* Dudley O. McGovney, *The Anti-Japanese Land Laws of California and Ten Other States*, 35 Calif. L. Rev. 7, 7–9 (1947). And during World War II, the government took into account the quantum of a citizen's Japanese blood in determining who would be held in internment camps. *See* J.L. DeWitt, *Final Report: Japanese Evacuation from the West Coast, 1942*, at 145 (1943) (noting that "[m]ixed-blood (one-half Japanese or less) individuals," among others, were eligible for exemption from evacuation).

The Supreme Court recently reaffirmed opposition to "[a]ncestral tracing of this sort" in laws that serve to enable race-based distinctions. *Rice v. Cayetano*, 528 U.S. 495, 510, 517, 524 (2000) (holding unconstitutional a Hawaiian constitutional provision that limited voting, by statute, to "any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778"). Because we have no need to use this metric, and because I doubt it would survive strict scrutiny, I join Judge Kozinski's concurrence in full and concur in the judgment only. It is regrettable that we did not take the opportunity as an en banc panel to remove *Bruce*'s first prong from our jurisprudence.