**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>VICTOR MANUEL REZA-RAMOS,<br>*Defendant-Appellant*. | No. 11-10029<br><br>D.C. No.<br>4:06-cr-01142-<br>FRZ-GEE-1<br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Frank R. Zapata, Senior District Judge, Presiding

Argued and Submitted March 11, 2013
Submission Vacated November 25, 2013
Resubmitted March 2, 2016
San Francisco, California

Filed March 9, 2016

Before: J. Clifford Wallace, M. Margaret McKeown,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

**SUMMARY**[*]

**Criminal Law**

The panel affirmed in part and vacated in part a criminal judgment, and remanded, in a case in which a non-Indian was convicted under 18 U.S.C. § 1111, the federal murder statute, for a murder on the Tohono O'odham Indian reservation.

The panel held that § 1111 was applicable to the defendant under the Indian General Crimes Act, 18 U.S.C. § 1152, which (among other things) makes federal criminal law applicable in federal enclaves when the defendant is a non-Indian and the victim is an Indian. The panel held that the government had the burden of proving beyond a reasonable doubt that the victim was an Indian, a jurisdictional element in this case, and that the government adduced sufficient evidence to establish both prongs of the Indian status test.

The panel also held that the evidence introduced at trial, taken in the light most favorable to the government, was sufficient to establish that Reza-Ramos acted with premeditation. The panel therefore affirmed the defendant's conviction for first degree premeditated murder.

The panel vacated the defendant's conviction for felony murder because the district court erred in defining the term "burglary" in § 1111 by reference under the Assimilated Crimes Act, 18 U.S.C. § 13, to Arizona's third-degree

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

burglary statute. The panel concluded that this error was not harmless because burglary, in the context of § 1111, is defined as the breaking and entering into a building or other structure with intent to commit a crime, and the government did not produce overwhelming evidence of a breaking.

## COUNSEL

Jon M. Sands, Federal Public Defender, and M. Edith Cunningham (argued), Assistant Federal Public Defender, Tucson, Arizona, for Defendant-Appellant.

John S. Leonardo, United States Attorney, and Bruce M. Ferg (argued), Assistant United States Attorney, Tucson, Arizona, for Plaintiff-Appellee.

## OPINION

IKUTA, Circuit Judge:

Victor Reza-Ramos, a non-Indian, appeals from his judgment of conviction under 18 U.S.C. § 1111, the federal murder statute, following his jury trial for the murder of Jose Flores on the Tohono O'odham Indian reservation in Arizona. We conclude that § 1111 was applicable to Reza-Ramos under the Indian General Crimes Act, 18 U.S.C. § 1152, which (among other things) makes federal criminal law applicable in federal enclaves when the defendant is a non-Indian and the victim is an Indian, because the government adduced sufficient evidence to establish that Flores was an Indian. We also hold that the evidence introduced at trial, taken in the light most favorable to the government, was

sufficient to establish that Reza-Ramos acted with premeditation. We therefore affirm Reza-Ramos's conviction for first degree premeditated murder.[1]  Nevertheless, we vacate Reza-Ramos's conviction for felony murder, because the district court erred in defining the term "burglary" in § 1111 by reference to Arizona's third-degree burglary statute, and this error was not harmless.

I

The Kisto Ranch is located on the Tohono O'odham Indian reservation near Sells, Arizona.  Fred Narcho, nephew of the ranch's deceased owner, hired Jose Flores to take care of the ranch after the owner died.  The ranch contained several structures, including the ranch house and a separate carport with walls and doors made of sticks extending from the ground to the roof, held together by horizontal supports. A black truck was parked in the carport.

Narcho and Flores planned to spend March 25, 2003, branding cattle.  On March 24, Flores mentioned over the phone to Narcho that he had a Mexican visitor at the ranch. When Narcho arrived at the ranch on the morning of March 25, Flores was not waiting for him at the corral or the shop. Narcho tried the ranch house, but it was locked.  Narcho noticed blood on the ground, a bloody rock, and drag marks leading over the end of a hill to a shallow ravine.  There Narcho found Flores's battered, bloody corpse with three big rocks on his chest and one on his face, and a bloody sweater next to him.  His face and head were "all smashed up."

---

[1] We reject Reza-Ramos's remaining arguments in a memorandum disposition filed concurrently with this opinion.  *See United States v. Reza-Ramos*, ___ Fed App'x ___ (2016).

Narcho notified the police, who arrived and started their investigation. The investigators discovered two beds in the ranch house and both appeared to have been used. They later learned that Flores slept in the bedroom on the west end of the ranch house, which adjoined a living room containing a fireplace.

Outside, at the northwest corner of the house, the investigators discovered a scuffle area. Within that area, police found a baseball cap with blood spatter, blood stains on the house and in the dirt, drag marks, and a metal scoop end of a broken fireplace shovel.

Investigators followed the drag marks down a hill into a shallow ravine, where Flores's body lay. Investigators found a bloody iron bar, later determined to be the handle of the fireplace shovel, on Flores's chest. A forensic analysis revealed hairs on the broken end of the shovel. An autopsy would later show that Flores died of "blunt force injuries to the head" consistent with a beating from the rock or the shovel handle. The injuries were caused by 60 separate strikes to the head and torso. Blood evidence around the body was consistent with the killer kneeling next to Flores while striking him.

Inside the carport, the police found the black truck. One of the truck's windows was broken and there were blood stains on the exterior and interior of the truck on the driver's side and on the steering wheel. The police also found fingerprints on the truck that did not belong to Flores. On some shelves next to the truck, investigators found blood-stained clothing covered up by a blanket. Police also found blood stains on nearby tools, including a broken knife handle, knife blade, hammer, and vice grips.

In January 2004, a Mexican citizen, Victor Manuel Reza-Ramos, was arrested in Mesa for simple drug possession. His prints were taken and entered into the database. In the spring of 2004, these prints were matched to prints taken at the scene of Flores's murder.

In 2006, federal prosecutors charged Reza-Ramos with first-degree premeditated murder and felony murder. Because the murder occurred on an Indian reservation, the indictment cited 18 U.S.C. §§ 13(a), 1111(a), 1151, and 1152. Section 1111(a) is the federal murder statute which criminalizes, among other things, "the unlawful killing of a human being with malice aforethought," including any "willful, deliberate, malicious, and premeditated killing." It also criminalizes felony murder, which is any murder "committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery." *Id.*[2] Sections 1151 and 1152

---

[2] 18 USC § 1111(a) states in full:

> (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to

make § 1111 applicable on an Indian reservation. Section 1152 provides that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country," and § 1151 defines "Indian country" as including "all land within the limits of any Indian reservation under the jurisdiction of the United States Government."[3]  Finally, 18 U.S.C. § 13, the

---

effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

[3] 18 U.S.C. § 1152 provides:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1151 provides, in pertinent part:

Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United

Assimilated Crimes Act ("ACA"), allows the government to apply state law in a federal enclave under certain circumstances. Specifically, a person who "is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment." 18 U.S.C. § 13(a).[4]

The indictment alleged that Reza-Ramos "intentionally kill[ed] and murder[ed] Jose Flores, an Indian, by beating him to death." The government proposed four alternative theories of first degree murder. First, the indictment alleged that Reza-Ramos committed murder with premeditation and malice aforethought. Second, the indictment alleged three alternative felony murder theories, that Reza-Ramos

States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation . . . .

[4] 18 U.S.C. § 13(a) provides in full:

(a) Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, or on, above, or below any portion of the territorial sea of the United States not within the jurisdiction of any State, Commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

committed murder: (1) "during the attempt to perpetrate the robbery of Jose Flores of a Chevrolet Silverado truck, a felony, in violation of [Ariz. Rev. Stat. Ann.] §§ 13-1001, 1902;" (2) during "the perpetration of the burglary of a nonresidential structure with the intent to commit the felony of robbery of a Chevrolet Silverado truck, a felony, in violation of [Ariz. Rev. Stat. Ann.] § 13-15[06](A); and (3) during "the perpetration of the burglary of a nonresidential structure with intent to commit the felony of theft of property" in violation of [Ariz. Rev. Stat. Ann.] § 13-1506(A).[5]  The state statutes define attempted robbery, § 13-1001 (defining attempt); 13-1902 (defining robbery); and burglary, § 13-1506(A) (defining third degree burglary as the "[e]ntering or remaining unlawfully in or on a nonresidential structure or in a fenced commercial or residential yard with the intent to commit any theft or any felony therein.").

At trial, the government presented an exhibit showing Flores's death certificate, listing Flores's race as "4/4 Tohono O'odham."  The government also introduced the medical examiner's report from the scene of the murder, which described Flores as "Native American."  One of the government's witnesses, RoseMarie Savala, testified that she had a "relationship" with Flores from 1998 until his death, and that Flores was a member of the Tohono O'odham tribe. Narcho, who hired Flores to take care of the Kisto Ranch, testified that Flores lived and worked on the Tohono O'odham reservation in Arizona, and spoke in Tohono O'odham.

---

[5] The indictment lists both Arizona Revised Statute § 13-1560(A) and § 13-1506(A) in regard to the burglary predicate offenses.  There is no Arizona Revised Statute § 13-1560(A), so we assume it was a scrivener's error.

At the close of the government's case, Reza-Ramos moved for a judgment of acquittal under Federal Rule of Civil Procedure 29, arguing insufficiency of the evidence of both first degree premeditated murder and felony murder. Reza-Ramos also argued that the indictment improperly charged him with felony murder premised on the Arizona offense of burglary of a non-residential structure. The district court denied the motion. Reza-Ramos unsuccessfully renewed the motion after the defense rested and after the verdict.

The jury instructions stated that to convict Reza-Ramos, the government must prove beyond a reasonable doubt that "Jose L. Flores was an Indian." The jury instructions on "burglary" stated:

> In order for you to find that the defendant committed a burglary with intent to commit theft, the government must prove each of the following elements beyond a reasonable doubt:
>
> The defendant entered, or remained unlawfully, in or on a nonresidential structure or in a fenced commercial or residential yard, and
>
> The defendant entered or remained unlawfully with the intent to commit any theft; and
>
> This unlawful or unprivileged entry occurred on the Tohono O'odham Indian reservation within the district of Arizona.

"Nonresidential structure" means any structure other than a residential structure and includes a retail establishment.[6]

The jury convicted Reza-Ramos of premeditated murder, felony murder premised upon commission of burglary with intent to commit theft, and felony murder premised upon commission of burglary with intent to commit robbery, all as charged in the indictment. The jury acquitted Reza-Ramos of felony murder premised upon commission of a robbery. This timely appeal followed. We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

II

We first consider Reza-Ramos's challenge to his conviction for first degree premeditated and felony murder under 18 U.S.C. § 1111 on the ground that the evidence was insufficient to establish that this statute is applicable to his conduct. According to Reza-Ramos, § 1111 does not apply to him under § 1152 unless Flores is an Indian. Further, Reza-Ramos claims that the government has the obligation of proving Flores's Indian status and there was insufficient evidence to prove this element here. In considering a sufficiency of the evidence claim, we must uphold the jury's verdict unless, viewing the evidence "in the light most favorable to the prosecution," no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158,

---

[6] The instructions for felony murder premised upon the alleged commission of the crime of burglary with intent to commit robbery are substantially the same.

1161 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

A

We first address a question of first impression: when the government charges a defendant with a federal crime made applicable to Indian country under the Indian General Crimes Act, 18 U.S.C. § 1152, does the government or the defendant have the burden of proving that the victim of the crime is an Indian or non-Indian? We review questions of law de novo, *United States v. Bynum*, 327 F.3d 986, 992 (9th Cir. 2003), and conclude that because the victim's Indian status here is a jurisdictional element, the burden is on the government.

Section 1152 provides that, in general, federal criminal laws "extend to the Indian country." But this rule has both a statutory and judicial exception.

First, the statute itself provides an exception: "This section shall not extend to offenses committed by one Indian against the person or property of another Indian." In other words, by its terms, § 1152 does not apply where both the perpetrator and victim of the crime are Indians. The purpose of this exception is to ensure "that federal criminal laws reached non-Indians committing crimes in Indian country, while at the same time preserving the right of the tribes to punish their own." *United States v. Bruce*, 394 F.3d 1215, 1219 (9th Cir. 2005).

There is also a judge-made exception to the rule that federal criminal law applies in Indian country. In *United States v. McBratney*, the Supreme Court considered the applicability of § 1152 to a case where both the perpetrator

and the victim were non-Indians, but the act at issue occurred on an Indian Ute reservation in Colorado. 104 U.S. 621 (1881). The Court reasoned that because Colorado had been admitted into the Union "upon an equal footing with the original States," Colorado "acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute Reservation, and that reservation is no longer within the sole and exclusive jurisdiction of the United States." *Id.* at 624. Given Colorado's exclusive criminal jurisdiction over non-Indians, the Court concluded that federal courts had "no jurisdiction to punish crimes within that reservation" of "offences committed by white men against white men," although federal courts did have jurisdiction "to carry out such provisions of the treaty with the Ute Indians as remain in force." *Id.*

In sum, when *McBratney* is read together with the exception in § 1152, the general laws of the United States extend to Indian country under § 1152 only when an Indian perpetrator commits a crime against a non-Indian victim, or a non-Indian perpetrator commits a crime against an Indian victim. *See Bruce*, 394 F.3d at 1221.

The burden of proving the applicability of the statutory exception in § 1152 is on the defendant, *United States v. Hester*, 719 F.2d 1041, 1042–43 (9th Cir. 1983), because it is in the nature of an affirmative defense, *Bruce*, 394 F.3d at 1223. As a general rule, the government does not have to "allege the non-applicability of an exception" written into a statute when charging a defendant under that statute. *Hester*, 719 F.2d at 1042–43; *see also McKelvey v. United States*, 260 U.S. 353, 357 (1922) ("[A]n indictment . . . need not negative the matter of an exception made by a proviso or

other distinct clause . . . . ").  Rather, the defendant must come forward with sufficient evidence regarding the applicability of the statutory exception to permit the finder of fact to decide the issue in the defendant's favor.  *See Bruce*, 394 F.3d at 1222–23.  Nevertheless, "the government retains the ultimate burden of persuasion—or 'the obligation to persuade the trier of fact of the truth of [the] proposition' . . . —that the exception [the defendant] claims is inapplicable." *Id*. at 1223.  Applying this rule, we have held that where the government alleges that the victims are Indians, the government has no obligation to plead and prove the defendant's non-Indian status under § 1152. *Hester*, 719 F.2d at 1043.  Instead, the defendant has the burden of production on this issue.  *Id.*  The result makes practical sense because where the government alleges that the victim is an Indian, "[i]t is far more manageable for the defendant to shoulder the burden of producing evidence that [the defendant] is a member of a federally recognized tribe than it is for the Government to produce evidence that [the defendant] is not a member of any one of the hundreds of such tribes."  *Id*.

By contrast, the judicial exception is jurisdictional.  Thus, "the government must prove the jurisdictional element in a federal criminal statute beyond a reasonable doubt, like any other element of the offense," *United States v. Gomez*, 87 F.3d 1093, 1096–97 (9th Cir. 1996).  Accordingly, the government has the burden of proving that the *McBratney* exception to federal court jurisdiction under § 1152 is not applicable.

In this case, it is undisputed that Reza-Ramos is a non-Indian.  Because Arizona was admitted into the Union upon an equal footing with the original states, *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 281 n.9

(1982), Arizona courts have jurisdiction over criminal cases involving two non-Indians, even if the criminal conduct occurs on an Indian reservation. *McBratney,* 104 U.S. at 624. Therefore, unless Flores is an Indian, the general laws of the United States would not be applicable to Reza-Ramos's offense and a federal court would have no jurisdiction to hear this case. *Id.* Because the district court's jurisdiction hinges on Flores's status, the government has the burden of proving this element. *Gomez*, 87 F.3d at 1096–97.

We therefore conclude that the government had the burden of proving beyond a reasonable doubt that Flores was an Indian.

B

Given this conclusion, we now turn to Reza-Ramos's argument that the government failed to carry its burden of proving Flores was an Indian. Proof of Indian status requires: "(1) proof of some quantum of Indian blood, whether or not that blood derives from a member of a federally recognized tribe, and (2) proof of membership in, or affiliation with, a federally recognized tribe." *United States v. Zepeda*, 792 F.3d 1103, 1113 (9th Cir. 2015) (en banc). Although *Zepeda* involved the applicability of § 1153, "the same test applies to the determination of Indian status" under both § 1153 and § 1152. *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009).

The first prong of the Indian status test, proof of some quantum of Indian blood, "requires ancestry living in America before the Europeans arrived, but this fact is obviously rarely provable as such." *Bruce*, 394 F.3d at 1223. As a result, "evidence of a parent, grandparent, or great-

grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong." *Id.* Reliable or undisputed documentation that a defendant has Indian blood, or testimony regarding the defendant's ancestry may meet this requirement. For instance, in *Zepeda*, a tribal certificate of enrollment stating that the defendant "had one-half Indian blood, with blood from the Pima and Tohono O'Odham tribes," along with testimony from the defendant's brother that their father was an Indian, satisfied the first prong. 792 F.3d at 1115. Similarly, in *Bruce*, a certificate of Indian blood confirming that the defendant was one-eighth Chippewa Indian, along with testimony that the defendant's mother and two children were enrolled members of an Indian tribe, was sufficient evidence of Indian blood. 394 F.3d at 1224.

Here, the evidence presented by the government included Flores's death certificate, which stated that his race was "4/4 Tohono O'odham," testimony that Flores was a Tohono O'odham tribal member, and a medical examiner's report describing Flores as "Native American." This evidence meets the first prong of the Indian status test. *See id*. at 1223–24. The government had no obligation to introduce additional evidence, such as verification of Flores's demographic information, given that the submitted evidence was undisputed. *See Zepeda*, 792 F.3d at 1115.

The second prong of the Indian status test "probes whether the Native American has a sufficient non-racial link to a formerly sovereign people," *Bruce*, 394 F.3d at 1224, by asking whether "the defendant was a member of, or affiliated with, a federally recognized tribe at the time of the offense," *Zepeda*, 792 F.3d at 1114. The criteria for such recognition are, in declining order of importance: (1) enrollment "in a

federally recognized tribe; (2) government recognition formally and informally through receipt of assistance available only to individuals who are members, or are eligible to become members, of federally recognized tribes; (3) enjoyment of the benefits of affiliation with a federally recognized tribe; [and] (4) social recognition as someone affiliated with a federally recognized tribe through residence on a reservation and participation in the social life of a federally recognized tribe." *Id*. Because the list of federally recognized tribes prepared by the Bureau of Indian Affairs (BIA) is the best evidence of a tribe's federal recognition, the question whether a tribe is federally recognized is a question of law. *Id.* at 1114–15. The government should "present to the judge evidence that the tribe was recognized at the time of the offense," but the judge may also "consult other evidence that is judicially noticeable or otherwise appropriate for consideration." *Id*. at 1114.

There is no dispute that the Tohono O'odham Nation of Arizona is a federally recognized tribe. Rather, Reza-Ramos disputes that the evidence introduced by the government established Flores's membership in the Tohono O'odham Nation of Arizona and not some unrecognized Tohono O'odham tribe. Although no tribal membership certificate was provided, the government presented undisputed testimony that Flores was a Tohono O'odham tribal member and that he lived and worked on the Tohono O'odham reservation in Arizona. This evidence was sufficient for a reasonable juror to conclude that Flores was a member of the Tohono O'odham Nation of Arizona. Flores thus met the most important criteria of "enrollment in a federally recognized tribe." *Zepeda*, 792 F.3d at 1114.

The testimony adduced at trial also showed that Flores enjoyed benefits of affiliation with the tribe by living and working on the reservation, and that he was recognized as a member of the tribe, the third and fourth criteria. Witnesses testified that Flores had lived in Sells, Arizona (the capital of the Tohono O'odham Nation) with his wife before she died in 1996, and that Flores had lived and worked on the reservation for five months before his murder. Flores's death certificate stated that he was buried at the Fresnal Canyon Village Cemetery in Fresnal, Arizona, which is located within the Tohono O'odham reservation. There was also undisputed testimony that Flores spoke the tribal language. While there was evidence that Flores had lived in Tucson before moving to the Tohono O'odham reservation, and still visited Tucson regularly, a reasonable juror could conclude that Flores had social recognition as someone affiliated with a federally recognized tribe given that he had lived and worked on the reservation for some time. *See United States v. LaBuff*, 658 F.3d 873, 878–79 (9th Cir. 2011) (holding that the lack of evidence of participation in tribal activities does not preclude an inference of social recognition). Although there was no evidence regarding Flores's receipt of benefits from the tribe, receipt of tribal assistance is only one indicia of tribal affiliation, not a mandatory factor. Accordingly, viewing the evidence in the light most favorable to the government, a reasonable juror could conclude that Flores met the second prong of the Indian status test.

There was sufficient evidence to show Flores met both prongs of the Indian status test, so we conclude that the government met its burden of establishing Flores's Indian status. Because the victim was an Indian, Arizona did not have exclusive jurisdiction over the crime, *see McBratney*,

104 U.S. at 624, and the government could prosecute Reza-Ramos under § 1111.

## C

Reza-Ramos also argues that the district court erred in failing to define "Indian" in the jury instructions. Because Reza-Ramos did not object to the instruction at trial, we review for plain error. *Zepeda*, 792 F.3d at 1115. "Plain error is (1) error, (2) that is plain, (3) that affect[s] substantial rights, and (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014) (internal quotation marks omitted) (alteration in original).

Under *Zepeda*, the court must instruct the jury both: (1) "that it has to find beyond a reasonable doubt that the defendant has some quantum of Indian blood"; and (2) "that it has to find beyond a reasonable doubt that the defendant was a member of, or affiliated with, a federally recognized tribe at the time of the offense." *Zepeda*, 792 F.3d at 1114. Further, "[i]f the court has found that the tribe of which the government claims the defendant is a member, or with which the defendant is affiliated, is federally recognized, it should inform the jury that the tribe is federally recognized as a matter of law." *Id.* at 1114–15. Although failure to provide such an instruction is an error, it does not affect the defendant's substantial rights where there is "clear and undisputed evidence that [the defendant] both had Indian blood and was an enrolled member of a federally recognized tribe." *Id*. at 1115.

Here, the jury instructions stated only that the government must prove beyond a reasonable doubt that "Jose L. Flores

was an Indian," and did not provide any instruction regarding the two prongs of the Indian status test. Accordingly, the court committed an error that is plain. Nevertheless, this error did not affect Reza-Ramos's substantial rights because, as discussed above, "there was clear and undisputed evidence that [Flores] both had Indian blood and was an enrolled member of a federally recognized tribe." *Id*. Thus, the court's jury instruction was not plain error.

III

Because we conclude that the government could charge Reza-Ramos with murder under § 1111, we address his additional argument that he could not be convicted of first degree premeditated murder because no rational trier of fact could have found that the killing was "deliberate" or "premeditated" beyond a reasonable doubt. *See Nevils*, 598 F.3d at 1163–64.

Premeditation is a required element of first-degree premeditated murder under § 1111(a). *See United States v. Begay*, 673 F.3d 1038, 1042 (9th Cir. 2011) (en banc). The district court here instructed the jury as follows on the element of premeditation:

> "Premeditation" means with planning or deliberation, so that the defendant planned or deliberated about killing Jose L. Flores before doing so. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough, after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing.

Reza-Ramos does not dispute that this is a correct statement of the law.

"Premeditation can be proved by circumstantial evidence." *Id*. at 1043. We have noted a range of relevant circumstantial evidence establishing that a defendant "acted with planning or deliberation in killing his victims" and that "there was sufficient time for him to plan or deliberate." *Id.* "Carrying the murder weapon to the scene is strong evidence of premeditation." *Id*. at 1043–44. The defendant need not carry the weapon over a long distance. *See id*. (noting that the jury could reasonably infer evidence of premeditation from the defendant's carrying of a gun across a street). Evidence that the defendant was not "agitated or rushed" gives rise to the inference that the defendant "had enough time to become fully conscious of his intent to kill and to consider the killing." *Id.* at 1044. Multiple strikes with multiple weapons over a long period of time suggest that the killing was not rushed. *Cooper v. Calderon*, 255 F.3d 1104, 1110 & n.5 (9th Cir. 2001). A jury can also reasonably infer evidence of premeditation from "calculated behavior" exhibited both before and after the killing, *Begay*, 673 F.3d at 1044 (quoting *Jackson*, 443 U.S. at 325), as well as from "the manner of the killing," *United States v. Free*, 841 F.2d 321, 325 (9th Cir. 1988). Finally, lack of evidence presented at trial to establish a motive on the part of the defendant to kill the victim does not preclude a reasonable juror from finding sufficient evidence of premeditation. *Begay*, 673 F.3d at 1045.

Viewing the evidence in the light most favorable to the government, there was sufficient evidence for a reasonable juror to find that the killing was premeditated. The government adduced evidence that Reza-Ramos had slept in

the ranch house, taken a fireplace shovel located inside the house to an area outside the house, and used it to beat Flores. A reasonable juror could infer from the evidence that Reza-Ramos had selected a weapon and carried it to the site of the murder. There was also evidence that after Flores had fallen to the ground, Reza-Ramos kneeled over his body and repeatedly struck him on the head and torso with both a rock and the shovel handle, from which a reasonable jury could infer that the killing was not rushed. Finally, the evidence was sufficient to show that Reza-Ramos had dragged the victim's body into the ravine, partially covered it with rocks, and concealed blood-stained clothing under a blanket in the carport. This evidence reasonably supports the inference that Reza-Ramos engaged in calculated behavior after the killing, which demonstrates "he was fully capable of committing premeditated murder." *Jackson*, 443 U.S. at 325. Because this evidence shows planning and deliberation, a reasonable juror could conclude that the killing was premeditated.

Accordingly, and because we reject Reza-Ramos's remaining challenges to his conviction of first degree premeditated murder in the memorandum disposition filed concurrently herewith, we affirm Reza-Ramos's conviction of this charge.

IV

Reza-Ramos also challenges his conviction for first degree murder on the felony murder theories. The government argues that because felony murder is merely an alternative means for proving mens rea, we need not address Reza-Ramos's arguments concerning felony murder after we affirm his conviction for premeditated murder. We disagree.

Should Reza-Ramos ultimately prevail in vacating his conviction of first degree premeditated murder (before the Supreme Court or on collateral review) on the ground that there was insufficient evidence of premeditation (or some other ground that is not equally applicable to his conviction of felony murder), the government might nevertheless be able to enforce Reza-Ramos's conviction for felony murder, given that the jury unanimously agreed on this alternative theory. *Cf. Griffin v. United States*, 502 U.S. 46, 56 (1991) (even a general verdict for a multiple-object conspiracy need not be set aside merely because the verdict is unsupportable on one of the alternate grounds and it is not possible to tell which ground the jury selected); *id*. at 61 (Blackmun, J., concurring) ("[T]he Government had two other means of avoiding the possibility, however remote, that petitioner was convicted on a theory for which there was insufficient evidence: The Government either could have charged the two objectives in separate counts, or agreed to petitioner's request for special interrogatories."); *see also Schad v. Arizona*, 501 U.S. 624, 630–45 (1991) (plurality opinion) (stating that when a state charges first degree murder as a single crime, the constitution does not require juries to be unanimous on whether the government proved the mens rea element under a felony-murder or premeditation theory).

Accordingly, we turn to Reza-Ramos's arguments that the district court erred in allowing the jury to convict him for felony murder under § 1111 by incorporating Arizona's third-degree burglary statute, Arizona Revised Statute § 13-1506(A), as a predicate felony under the ACA. We review de novo whether the ACA permits federal prosecution under the state statute at issue. *United States v. Waites*, 198 F.3d 1123, 1126 (9th Cir. 2000).

A

The ACA provides that in federal enclaves, a person who "is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment." 18 U.S.C. § 13(a). The statute therefore "assimilates into federal law, and thereby makes applicable on federal enclaves . . . certain criminal laws of the State in which the enclave is located." *Lewis v. United States*, 523 U.S. 155, 158 (1998). "[T]he ACA is . . . made applicable to Indian reservations by 18 U.S.C. § 1152," *United States v. Marcyes*, 557 F.2d 1361, 1364 (9th Cir. 1977), and thus is applicable here, where the alleged crime occurred on the Tohono O'odham reservation.

As we recently explained, *see United States v. Rocha*, 598 F.3d 1144, 1147–48 (9th Cir. 2010), our analysis of whether a defendant in a federal enclave can be charged with violating a state criminal statute under the ACA is guided by the Supreme Court's decision in *Lewis*. In *Lewis*, a defendant was charged with violating Louisiana's first-degree murder statute for beating and killing a four-year-old girl on a federal Army base in Louisiana. 523 U.S. at 158. Relying on the ACA, the government charged the defendant with a violation of a state first-degree murder statute, which defined first degree murder to include the killing of a human being with the "specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve." *Id.* at 158, 167 (internal quotations and citations omitted).

The Court concluded that the defendant could not be charged with a violation of the state law, and it set out a framework for analyzing the ACA. By its terms, the ACA applies to acts or omissions "not made punishable by any enactment of Congress." 18 U.S.C. § 13(a). However, the Court concluded that it would be an error to interpret the phrase "any enactment of Congress" too broadly, because "[t]he Act would be unable to assimilate even a highly specific state law aimed directly at a serious, narrowly defined evil, if the language of any federal statute, however broad and however clearly aimed at a different kind of harm, were to cover the defendant's act." *Id.* at 161. Such an overbroad interpretation would defeat the purpose of the Act, which is to "fill gaps in the federal criminal law that applies on federal enclaves," *id.* at 160.

Therefore, *Lewis* articulated a two part test for applying the ACA to determine whether state criminal law applies in a federal enclave. *Id.* at 164*; see also Rocha*, 598 F.3d at 1148. First, a court must determine whether the defendant's act is made punishable by *any* act of Congress. *Lewis*, 523 U.S. at 164. If the answer is no, then state law may be assimilated. *Rocha*, 598 F.3d at 1148 (quoting *Lewis*, 523 U.S. at 164).

If a federal law does punish the defendant's act, the court must proceed to the second question and determine Congress's intent, i.e., "[d]oes applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?" *Lewis*, 523 U.S. at 166. As we explained in *Rocha*, "The Court gave three examples of when a federal enactment precludes application of a state law: (1) application of the state law 'would interfere with the achievement of a federal policy';

(2) application of the state law 'would effectively rewrite an offense definition that Congress carefully considered'; or (3) the 'federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue.'" 598 F.3d at 1149 (quoting *Lewis*, 523 U.S. at 164).

Applying this two-part test, *Lewis* first concluded that the defendant's act (the murder of the four-year-old) was punishable by the federal murder statute, 18 U.S.C. § 1111, and thus "punishable by any enactment of Congress." 523 U.S. at 168. The Court then turned to the second question: "Does applicable federal law indicate an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue?" *Id*. The Court conceded that the state statute focused on a narrower and different range of conduct than § 1111. *Id.* at 169. Nevertheless, the Court concluded that given "[t]he complete coverage of the federal statute over all types of federal enclave murder," Congress intended the federal murder statute to preclude application of Louisiana's murder statute. *Id.* In fact, "Congress intended its statute to cover a particular field—namely, 'unlawful killing of a human being with malice aforethought'—as an integrated whole." *Id.* In reaching this conclusion, the Court rejected the government's arguments that the state murder law was a child protection statute that filled a gap in § 1111. *Id.* at 171–72.

*Lewis* is directly applicable here. The first question is whether Reza-Ramos's conduct was made punishable by any enactment of Congress. It clearly was, because the government charged Reza-Ramos with murdering Flores during the commission of a burglary, and this conduct was punishable as a murder "committed in the perpetration of . . . burglary" under the federal murder statute, 18 U.S.C. § 1111.

*Lewis* also controls the answer to the second question, whether applicable federal law indicates an intent to punish murder to the exclusion of the particular state statute at issue. *Lewis* has already ruled that in enacting § 1111, Congress intended to preclude application of state statutes, and to provide complete coverage "over all types of federal enclave murder." *Id.* at 169. Moreover, *Lewis* held that Congress did not intend to allow state law to fill any purported "gap" in § 1111. Therefore, we conclude that Congress did not intend to allow Arizona criminal law to fill a "gap" in § 1111, and the government can convict Reza-Ramos only under § 1111 to the exclusion of state law.

We acknowledge that the issue here is distinguishable from the situation in *Lewis*: the defendant in *Lewis* was directly charged with a state crime, while here, Reza-Ramos was charged with federal murder, and the government seeks to use state law to define one of the terms ("burglary") in the federal murder statute. But if anything, this distinction weighs against assimilating state law here. Where *Lewis* raised a question about the interpretation of the ACA, namely whether the ACA allows the government to charge a defendant who committed a crime in a federal enclave under state law, this case raises a completely different question of statutory interpretation, namely, how should we interpret a specific term in § 1111. The ACA has no bearing on this question. And with respect to this statutory interpretation question, the Supreme Court has been clear: "in the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law." *United States v. Turley*, 352 U.S. 407, 411 (1957); *see also Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119–20 (1983) (holding that absent plain Congressional intent to the contrary, courts

should not construe federal laws so that their application is dependent on state law). Rather, when a federal criminal statute uses an undefined term, a court must determine the definition of that term through ordinary tools of statutory construction. *See, e.g.*, *Taylor v. United States*, 495 U.S. 575 (1990) (construing the term "burglary" for purposes of 18 U.S.C. § 924(e) by reference to legislative intent); *Perrin v. United States*, 444 U.S. 37, 42–49 (1979) (construing the undefined term "bribery" in the federal Travel Act by applying canons of statutory construction).

We take this approach even when considering the applicability of state law under the ACA. For instance, in *Rocha*, a defendant in a federal correctional facility was charged with assault in violation of a state statute, assimilated into federal law by the ACA. 598 F.3d at 1146. Applying the first part of the *Lewis* test, we determined that Rocha's conduct was made punishable by the federal assault statute. *Id*. at 1148. Because the federal assault statute did not define assault, we adopted the common law definition and concluded that it punished the defendant's wrongful conduct, and thus the ACA did not properly assimilate the state law. *Id.*; *see also United States v. Lewellyn*, 481 F.3d 695, 697 (9th Cir. 2007) (adopting common law definition for assault under 8 U.S.C. § 113). Similarly, in *United States v. Lilly*, we defined the "robbery" predicate offense to felony murder under § 1111 by reference to the federal robbery statute, which we interpreted in light of common law to include a specific intent element. 512 F.2d 1259 (9th Cir. 1975).[7] In

---

[7] We therefore reject the Fourth Circuit's conclusory and unreasoned statement that because there is no federal burglary statute, the ACA incorporates the state law of burglary into § 1111. *See United States v. Scheetz*, 293 F.3d 175, 187 (4th Cir. 2002).

neither case did we look to state law to define a term in the federal offense.

When Congress intends to define terms in federal criminal statutes by reference to state law, it does so explicitly. The Indian Major Crimes Act, 18 U.S.C. § 1153, provides a list of criminal offenses and states that any offense "that is not defined and punished by Federal law . . . shall be defined and punished in accordance with the laws of the State in which such offense was committed." 18 U.S.C. § 1153(b). Applying this language, we determined that where the defendant's conduct — the burglary of a private residence — was not "defined and punished by Federal law," the offense had to "be defined and punished" under state law, pursuant to § 1153. *United States v. Bear*, 932 F.2d 1279, 1281 (9th Cir. 1990).

But contrary to the government's argument, *Bear* and other cases interpreting § 1153 are inapposite here because the ACA does not require the offenses listed in § 1111 to be "defined" under state law. Rather, the ACA directs courts to assimilate state statutes only when an act or omission is "not made punishable by any enactment of Congress." Because the language of § 1153 makes clear that Congress knew how to instruct courts to use state law to define an offense listed in a state statute, we may infer that Congress did not intend courts to define "burglary" in § 1111 by reference to state law.

Because *Lewis* holds that § 1111 punishes murder in a federal enclave, including felony murder, and the lack of a definition for "burglary" in § 1111 does not create a gap that must be filled by state law, we conclude that the district court

erred in incorporating the Arizona burglary statute under the
ACA.

B

Although the district court erred in convicting Reza-
Ramos of felony murder predicated on a state crime of
burglary, this error may still be harmless if the jury
instructions included all the elements of burglary as defined
in § 1111, or if there was "overwhelming" and
uncontroverted evidence of any missing element in the
instruction so that no jury could reasonably find that the
government had not proven that element beyond a reasonable
doubt. *Neder v. United States*, 527 U.S. 1, 9 (1999). In order
to determine if the error here is harmless under *Neder*, we
must first determine the elements of burglary under § 1111.

Over the course of some forty years, the Supreme Court
has developed a framework for determining the meaning of
an undefined criminal offense in a federal statute. The Court
first addressed this issue in a series of cases interpreting the
Travel Act, 18 U.S.C. § 1952, which (among other things)
makes it unlawful to engage in specified unlawful activities,
defined by the statute to include "extortion, bribery, or arson
in violation of the laws of the State in which committed." *See
Perrin*, 444 U.S. 37; *United States v. Nardello*, 393 U.S. 286
(1969). In these cases, the Court first considered the
legislative history of the act at length, and determined that
Congress's intent in enacting the Travel Act was to
supplement state authority and enforcement. *Perrin*, 444 U.S.
at 42; *Nardello*, 393 U.S. at 292. In light of this legislative
history, the Court concluded that Congress intended the term
"extortion" in § 1952(b) to refer to a generic offense, and
rejected the argument that Congress intended "extortion" to

mean only state crimes labeled as such. *Nardello*, 393 U.S. at 293–94. The Court then considered the specific offense terms in the federal act in light of their ordinary meaning at the time Congress enacted the Travel Act in 1961. *Perrin*, 444 U.S. at 42–43. Having determined that "by the time the Travel Act was enacted in 1961, federal and state statutes had extended the term bribery well beyond its common-law meaning," *id.* at 43, the Court rejected petitioner's argument that Congress intended to adopt a narrow common law meaning, *id*. at 49; *see also Nardello*, 393 U.S. at 296 ("In light of the scope of the congressional purpose we decline to give the term 'extortion' an unnaturally narrow reading."). Instead, the Court held that Congress intended the contemporary "generic definition" of the offense terms in the Travel Act, which included bribery and extortion relating to private individuals as well as public officials. *Perrin*, 444 U.S. at 49.

The Supreme Court took the same approach in *Taylor* when interpreting the term "burglary" in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). 495 U.S. 575. This section of ACCA (among other things) imposes a sentencing enhancement on a person convicted of three violent felonies, and defines the term "violent felony" to include convictions for burglary, arson, or extortion. 18 U.S.C. § 924(e)(2)(B); *see Taylor*, 495 U.S. at 578. The Court again began with a thorough review of the legislative history of § 924(e). *Taylor*, 495 U.S. at 581. Based on this review, the Court discerned that the intent and purpose of the Act was to supplement the states' efforts against career criminals, which included ensuring that "the same type of conduct is punishable on the Federal level in all cases," *id.* at 582 (quoting S. Rep. No. 98–190, at 20 (1983)). Given this review, the Court rejected the argument that the offense terms

should be given their narrow common law meaning, explaining that "[t]he arcane distinctions embedded in the common-law definition have little relevance to modern law enforcement concerns." *Id.* at 593. The Court declined to incorporate common law definitions that were "ill suited" to Congress's purpose "[i]n the absence of any specific indication that Congress meant to incorporate" such common law meanings. *Id.* at 594. Accordingly, the Court concluded that Congress "had in mind a modern 'generic' view of burglary, roughly corresponding to the definitions of burglary in a majority of the States' criminal codes" at the time of its enactment in 1984 and reenactment in 1986. *Id.* at 589. The Court therefore reviewed the modern statutory definitions of "burglary" and derived the rule that "a person has been convicted of burglary for purposes of a § 924(e) enhancement if he is convicted of any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Id.* at 599.

Therefore, in interpreting a federal statute that references a criminal offense that is otherwise undefined, a court must consider legislative history of the act to determine the intent and purpose of the law. If neither the text nor legislative history indicates that Congress intended "to incorporate diverse state laws into a federal criminal statute," *Turley*, 352 U.S. at 411, the court should develop "uniform categorical definitions," *see Taylor*, 495 U.S. at 591. Nor should a court use a narrow common law definition of the criminal offenses when doing so would be contrary to Congressional intent. "In the absence of any specific indication that Congress meant to incorporate" common law meanings, *id*. at 594, a court should survey the state law understanding of the crimes current at the time of the

enactment (or reenactment) of the federal statute, and derive from that review a generic definition of the offense.

## C

We now apply these principles to our analysis of the word "burglary" in § 1111, which defines "murder in the first degree" to include murder "in the perpetration of . . . burglary." The term "burglary" is not defined in the statute, so we turn to the legislative history. The original federal murder statute was enacted in the Act of March 4, 1909, as section 273. The purpose of the act was to codify, revise, and amend all the laws of the United States. Act of March 4, 1909, Pub. L. No. 60-350, ch. 321, 35 Stat. 1088 (preamble). The codification of federal criminal law was a "comprehensive effort" which included expanding the scope of some crimes and adding new federal laws, some of which were explained by reference to state law. John L. McClellan, *Codification, Reform, and Revision: The Challenge of a Modern Federal Criminal Code*, 1971 Duke L. J. 663, 677, 679. This "clear and systematic compilation" was intended to become "the original and authoritative law of the land," covering "the whole field of common law and statutory crime." *Id.* at 678 (internal quotations omitted).

As we have previously explained, the federal murder statute (originally § 273, now § 1111) "was passed by Congress to 'enlarge the common law definition' of murder." *United States v. Spencer*, 839 F.2d 1341, 1343 (9th Cir. 1988) (quoting Special Joint Comm. on the Revision of the Laws, Revision and Codification of the Laws, Etc., H.R. Rep. No. 2, 60th Cong., 1st Sess., pt. 1, at 24 (1908)). "The enlarged § [273] definition was 'similar in terms to the statutes defining murder in a large majority of States.'" *Id*. Section

273 was codified without change in 1946 as 18 U.S.C. § 452 (1946).

In 1948 there was a second major revision to the federal criminal code. McClellan, 1971 Duke L. J. at 683. Despite extensive changes to other sections of the code, § 452 (formally § 273) was reenacted without change as part of § 1111. The Reviser's Notes to the 1948 revision do not indicate any intention to change the meaning of "burglary" in § 1111. *See* H.R. Rep. No. 304, 80th Cong., 1st Sess., at A89–90 (1947).[8]

We conclude that Congress's intent in enacting § 273 (now § 1111) was to modernize and make uniform the federal criminal law with respect to murder. Given this goal, and legislative history indicating that the proposed murder statute enlarged the common law, there is no "specific indication that Congress meant to incorporate" common law meanings into § 1111. *Taylor*, 495 U.S. at 594. We therefore conclude that Congress did not use a narrow common law definition of the predicate offenses in § 1111.

Based on this analysis, we must survey the state law understanding of burglary in 1909, when the law was

---

[8] Indeed, during a Congressional hearing by the Subcommittee of the Committee on the Judiciary on June 5, 1946, one Congressman asked a member of West Publishing Company, who worked on the bill recodifying the criminal code, "What is the difference between what [§ 1111 in this] bill will be when it is enacted into law and what it is now?" Hearing on H.R. 2200 Before the Subcomm. of the H. Comm. on the Judiciary, 79th Cong. 12 (June 5, 1946). The West representative responded: "We did not change the Homicide Statute at all." *Id.*

enacted.[9] As explained in *Taylor*, the common-law definition
of "burglary" is "a breaking and entering of a dwelling at
night with intent to commit a felony." *Taylor*, 495 U.S. at
576.  Based on our review, by 1909 a majority of states had
expanded this common law definition by statute.  Although
most relevant state statutes did retain the element of breaking,
i.e., forced entry, *see e.g.*, Ala. Code § 6415 (1907); Del. Rev.
Stat. § 4727 (1915); Kan. Gen. Stat. § 2549 (1910), a majority
of state statutes in 1909 either eliminated the element of
nighttime entry in defining the crime of burglary and
specified that the act could occur at any time, *see e.g.*, Ind.
Stat. Ann. § 2264 (1908); Miss. Code Ann. § 1066 (1906);
Wyo. Stat. Ann. § 5819 (1910), established different levels of
culpability if the act took place during the day or night, *see
e.g.*, W. Va. Code Ann. § 5202 (1914); Nev. Rev. Stat. § 6634
(1920), or were silent on the applicable time frame, *see e.g.*,
Cal. Penal Code § 459 (1909); Fla. Stat. Ann. § 3281 (1915).
Many of the relevant state statutes did not limit burglary to
entry into a dwelling, but rather included a list of enumerated
buildings that would qualify.  *See, e.g.*, Ark. Code Ann.
§ 1603 (1904); Cal. Penal Code § 459 (1909); Ill. Rev. Stat.,
ch. 38, § 36 (1908).  And a majority of the state burglary
statutes did not require an intent to commit a felony, but

---

[9] Although § 1111 was reenacted in 1948, Congress made no changes
to the statutory language, nor gave any indication that it intended to make
any change in the law.  Nor can we infer that Congress intended to
incorporate a consistent judicial interpretation of "burglary," because none
existed at that time.  Therefore, we must consider Congress's intent as of
1909 when the statute was originally enacted.  *See Pierce v. Underwood*,
487 U.S. 552, 566–67 (1988) (holding that when Congress reenacts a
statute without changing its language, and when there is no indication that
"Congress thought it was doing anything . . . except reenacting and
making permanent" the earlier legislation, a court should not give weight
to legislative history pertaining to the reenactment).

merely an intent to commit a range of crimes.  *See, e.g.*, Minn. Gen. Stat. § 8826 (1913); N.D. Penal Code § 9868 (1914); Tex. Penal Code Art. 838 (1910).  In sum, by 1909, the generic definition of "burglary" had a scope broader than the common law definition.  With the exception of the requirement of "breaking and entering," which was retained by the majority of state statutes at the time, the 1909 definition was analogous to the definition of the crime described in *Taylor*.  We thus conclude that burglary, in the context of § 1111, is defined as the breaking and entering (i.e., a forcible entry) into a building or other structure with intent to commit a crime.  *See Taylor*, 495 U.S. at 598.

With the correct definition of burglary in mind, we now turn to the question whether the government and district court's error in predicating the charge of felony murder under § 1111 on a state crime of burglary was harmless beyond a reasonable doubt.  The jury was instructed that it had to find, "beyond a reasonable doubt," that the "defendant entered, or remained unlawfully, in or on a nonresidential structure or in a fenced commercial or residential yard."  Unlike the generic federal offense of burglary, this instruction did not require the jury to find that Reza-Ramos made a forcible entry into a building or other structure.  Although this error could be harmless beyond a reasonable doubt if there were overwhelming evidence of these missing elements, *Neder*, 527 U.S. at 9, the error was not harmless here.  Although there was evidence at trial that Reza-Ramos had broken a window in the truck and used various tools in an attempt to steal it, the government presented no evidence that Reza-Ramos had forcibly entered into the carport, even assuming that the carport constitutes a building or structure.  Thus, under *Neder*, there was not overwhelming evidence of a

breaking. *Id.* As a result, we vacate the conviction for felony murder.[10]

V

Accordingly, we affirm Reza-Ramos's conviction for first degree premeditated murder under § 1111. This federal criminal statute applied to Reza-Ramos under § 1152 because it was undisputed that Reza-Ramos was a non-Indian, and, viewed in the light most favorable to the government, the evidence of the victim's Indian status was sufficient to establish federal jurisdiction over the offense. We vacate Reza-Ramos's conviction on a theory of felony murder, because the district court erred in defining the term "burglary" in § 1111 by reference to state law, and this error was not harmless.

**AFFIRMED in part, VACATED in part, and REMANDED.**

---

[10] Because we vacate Reza-Ramos's felony murder conviction on this ground, we do not reach the question whether there was sufficient evidence to show that the murder was "committed in the perpetration of . . . burglary" for purposes of § 1111.